2019 IL App (1st) 152760

No. 1-15-2760

Second Division
May 7, 2019

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 3349 |
| | ) | |
| FERNANDO GONZALEZ, | ) | Honorable |
| | ) | Colleen Ann Hyland, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justices Mason and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Fernando Gonzalez was found guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)) against E.S. (count I) and A.B. (count II), two counts of aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(ii), (d)) against E.S. (counts III and V), and two counts of aggravated criminal sexual abuse against A.B. (counts IV and VI). The trial court merged the respective aggravated criminal sexual abuse counts against each victim into the two criminal sexual assault counts against each victim (counts I and II) and sentenced defendant to 10 years in prison on each count, to be served consecutively.

¶ 2    On appeal, defendant contends (1) the evidence was insufficient to prove him guilty because the State did not prove sexual penetration or that he used force or threat of force; (2) counsel was ineffective for failing to move to dismiss the new charges filed against him in 2015, as his statutory right to a speedy trial was violated; (3) the trial court erred because it did not comply with the *Batson* procedure (*Batson v. Kentucky*, 476 U.S. 79 (1986)) after he made a gender-based objection to the State's peremptory challenges; (4) the trial court erred when it allowed trial counsel to represent him during pretrial proceedings when a *per se* conflict of interest existed; and (5) certain fines and fees were improperly assessed. For the reasons below, we affirm defendant's convictions but remand to the trial court for the sole purpose of correcting the fines and fees order.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant's convictions arose from sexual assaults of two 13-year-old girls, A.B. and E.S., that occurred in August 2012. In February 2013, defendant was initially charged by indictment with nine counts. Seven counts alleged sexual offenses against A.B. only, including criminal sexual assault (count I), aggravated criminal sexual abuse (counts II, III, and IV), indecent solicitation of a child (counts V and VI), and criminal sexual abuse (count IX). The remaining two counts referred to E.S. and alleged he committed sexual exploitation of a child by persuading A.B. (count VII) and E.S. (count VIII) to remove E.S.'s clothing for the purpose of sexual arousal or gratification.

¶ 5    On the July 26, 2013, court date, defendant's private counsel, Timothy Grace, informed the court that the parties were negotiating a potential resolution. On the next court date, August 29, 2013, Grace told the court that the State "sort of" made an offer that it had to put in writing.

Grace also informed the court that an issue had arisen "about a week ago" regarding defendant's prior case from 2000 that could be the subject of a motion for proof of other crimes. Grace told the court that he was the assistant state's attorney (ASA) on that case and had taken a statement from defendant. The court concluded that, before it addressed the State's plea offer, it needed to address the conflict issue and whether Grace had an obligation to withdraw or if defendant could waive the conflict. The court told defendant, "this is a matter that we will continue conversations with you about and you can speak to your attorney about." The court continued the case for the parties to research the matter.

¶ 6    On December 1, 2013, defendant, through Grace, filed a "motion to allow the defendant to waive the *per se* conflict and for Timothy M. Grace to continue as his attorney of record." In the motion, defendant requested to waive any *per se* conflict and stated that the issue should be revisited if the State filed a motion for proof of other crimes. To the motion, defendant attached an affidavit, acknowledging that Grace was the ASA on his 2000 case involving the charge of aggravated criminal sexual abuse and averring he wanted Grace as his attorney and was knowingly and intelligently waiving any conflict of interest.

¶ 7    On the December 10, 2013, court date, Grace informed the court that he had filed the motion to waive the conflict of interest, and the court continued the case for a hearing. On the January 14, 2014, hearing date, Grace acknowledged there was a potential conflict of interest but that it would be triggered only if the State filed a motion for proof of other crimes. The court continued the case so it could review the parties' case law, and on the next court date, the court tendered case law on the conflict of interest issue to the parties and continued the matter, noting

that the State had not filed a motion for proof of other crimes. The State informed the court that it could make an oral motion stating that it would not file such a motion.

¶ 8    On the next court date, the State informed the court that defendant had rejected its offer and that, if the case went to trial, it may introduce proof of other crimes. The court told the parties that, if the State filed a motion for proof of other crimes, there was a conflict that defendant could not waive because Grace could potentially be called as a witness against defendant. The court continued the case, instructing Grace to speak to defendant about getting a new attorney. Thereafter, on May 20, 2014, the State filed a motion to admit evidence of defendant's prior sex offense. On June 13, 2014, the court held a hearing on defendant's motion to waive *per se* conflict, after which it found that defendant could not waive the conflict and disqualified Grace from representing him. The court stated that the State filed a motion for proof of other crimes and the cases "now take on the relationship of being related." It noted that Grace could not provide undivided loyalty when he "is put in a position where he has to argue his other crimes evidence in which he was involved in the prosecution of, and that is where it takes it to a different level." In August 2014, another attorney appeared on defendant's behalf.

¶ 9    On February 26, 2015, a grand jury reindicted defendant on six charges (case No. 15-CR-3349) and the State nol-prossed the charges in the 2013 indictment (case No. 13-CR-3485). Two counts alleged defendant committed criminal sexual abuse in that, by the use or threat of force, he committed an act of sexual penetration by placing part of his hand into the sex organ of E.S. (count I) and into the sex organ of A.B. (count II). Two counts alleged he committed aggravated criminal sexual abuse in that he committed an act of sexual conduct by touching either directly or through clothing the sex organ of E.S. (count III) and the sex organ of A.B. (count IV) and he did

so using force or threat of force. Two counts alleged he committed aggravated criminal sexual abuse in that he committed an act of sexual conduct by touching, for the purpose of sexual gratification or arousal, the sex organ of E.S. (count V) and the sex organ of A.B. (count VI).

¶ 10 Upon filing the new indictment, the State told the court that the original indictment only pertained to one victim "for some reason," it reindicted defendant to include the other victim, "there were no surprises," and there was "nothing really new." The State informed the court that it had made a plea offer on the 2013 indictment but defendant rejected it. With respect to the new charges, the State told the court the parties were discussing the possibility of a plea offer, and defense counsel stated it looked like they were "pretty far apart."

¶ 11 Defendant elected for a jury trial and the case proceeded to jury selection. The court and the parties questioned the potential juror members in panels of 18, and each party had seven peremptory challenges. The first panel consisted of three men: Arturo Rivera, Roger Brown, and Gregory Jackson. The court dismissed Rivera for cause, and the State requested to dismiss Brown for cause because he was not forthcoming about previous criminal charges against him for solicitation for a sexual act and domestic battery. After the court questioned Brown, it denied the State's challenge for cause, noting that it accepted Brown's statement that he misunderstood the question about whether he had been "accused" in a criminal case. The State used four peremptory challenges on the first panel: Brown, Jackson, and two women.

¶ 12 The second panel of 18 potential jury members consisted of four men: Angel Oliveros, Dion Hampton, Wesley Merritt, and Ronald Czimra. After the second panel was questioned, the State used its three remaining peremptory challenges on Hampton and two women. Defendant made a *Batson* gender-based objection to the State's peremptory challenges on Jackson, Brown,

and Hampton, arguing that the State used its challenges on "three out of the four men" and the panel was overwhelming female. The following exchange occurred after defendant objected:

"THE COURT: They left in Angel Oliveros, and he is a male, is that correct?

[DEFENSE COUNSEL]: Just one, Judge.

THE COURT: Do you wish to respond, [ASA]?

[ASA]: Just for the record, Judge, we didn't exercise our peremptory on Mr. Merritt, so the record is clear, we had not stricken him. He was in the last row, so that is another that was acceptable, Judge.

THE COURT: That's correct. And also, Mr. Czimra, Mr. Czimra was left on.

[ASA]: And [another ASA] will explain the other two."

The State explained that Jackson had been a defendant in a murder trial in which he was found not guilty and could have a bias against the State or law enforcement for bringing charges against him.[1] It stated that Brown had been previously charged with domestic battery and solicitation of a sex act and "could be harboring some sort of bias against women." With respect to Hampton, the State explained that he was a "very young man," lived with his parents, had little life experience, recently graduated from high school, and "was an adolescent himself." Following the State's explanations, the court stated:

"I don't find any gender basis for any Battseon [*sic*] challenge. I don't even find that the first prong would be met, but the State did provide neutral reasons, even though I

---

[1]The report of proceedings shows that the State incorrectly referred to Gregory Jackson as Gregory Johnson.

didn't require them to, they did provide them, and I don't find that there is a basis for a gender Batteson [*sic*] challenge.

I accept all their neutral reasons, yet I don't even find that they're required to provide it."

At this time, there were 12 juror members selected, and jury selection continued to selecting the alternatives from the second panel. Each party had one peremptory challenge for the alternates. The State exercised a peremptory challenge on a woman, and defendant did not use any challenges, which left two men from the second panel, Wesley Merritt and Ronald Czimra, as the alternates.

¶ 13    The case proceeded to the jury trial. E.S. testified that, on August 3, 2012, she and A.B. were walking to the park when defendant, whom she identified at trial, approached them, asked for directions, told them they could make money modeling, and gave them a card with his telephone number. E.S. and A.B. walked to a gazebo in the park, and about five minutes later, defendant approached them again. He asked to take photographs of them inside his car. E.S. testified that she felt scared and that defendant "grabbed my arm and pulled" her to the car.

¶ 14    E.S. went inside his car and sat in the front seat while defendant sat in the other front seat. They talked about defendant's family for a few minutes, and then defendant told her to get into the back seat. E.S. crawled over the seat. Defendant asked E.S. to pose and he took photographs of her with his cellular telephone. Defendant told E.S. to smile and told her she was "sexy and beautiful, gorgeous." E.S. testified that, after defendant took the photographs, he "forced down my shorts" and "put his hands on my shorts and pulled them down." She testified that defendant used both of his hands to spread her legs and his "two thumbs went underneath

my underwear and touched the vagina area" and he "rubbed in the thumbs and pushed in" the vagina. E.S. got mad and slapped his hand away. Defendant lifted her shirt and touched her breasts. E.S. pulled up her pants and tried to leave. The doors were locked, and defendant blocked her with his arm when she tried to get out of his car. E.S. was eventually able to run out of the car. She did not tell A.B. what happened because she was embarrassed. Before she left the car, defendant gave her $3. Defendant came to the gazebo, and A.B. followed him inside his car. About 10 to 20 minutes later, A.B. came back to the gazebo. E.S. and A.B. accepted defendant's offer to drive them home.

¶ 15    When E.S. got home, she was excited about becoming a model. As the night continued and A.B. and E.S. talked and thought about what had happened, they "both realized that what happened to us was wrong" and she "felt violated." E.S. texted defendant, stating "I don't think my mom will let me be your model." She did not tell her parents what happened because she was scared.

¶ 16    The next day, E.S. and A.B. told A.B.'s mother what had happened, and A.B.'s mother called the police. On August 7, 2012, E.S. went to the police station and told the police what happened. On January 2, 2013, E.S. identified defendant in photographs as the person who was in the backseat with her on August 3, 2012, and on January 23, 2013, she identified defendant in a lineup as the person who took photographs and touched her in the park.

¶ 17    The State showed E.S. a diagram of the female genitalia sex organ and asked E.S. to indicate the two areas where defendant's "two thumbs touched" her. E.S. circled the labia majora and testified that, when defendant placed his two thumbs there, he was "rubbing and pressing down." She testified that the photograph represented the "whole" vagina, and on cross-

examination, she testified that the two circles where she indicated he touched were "above the vagina."

¶ 18    A.B. testified that, on August 3, 2012, she was walking to the park with E.S. when a man, whom she identified at trial as defendant, approached them and told them they were beautiful. He told them he could make them models and gave them a business card. A.B. felt happy because she wanted to make money. E.S. and A.B. walked to a gazebo in the park, and defendant came up to them, sat down, and started talking to them more about modeling. He told them he wanted to take photographs of them for his catalog and wanted to do so inside of his car because of the sun.

¶ 19    E.S. went inside defendant's car first. A.B. did not see defendant pulling E.S. or forcing her into the car. After about 20 minutes, E.S. returned and told A.B., "It's your turn," and did not tell her what had happened. A.B. wanted to go with defendant because she thought it was for his catalog to become a model. Defendant opened the back door, and A.B. sat in the middle seat. Defendant asked A.B. if she had boyfriend and if she wanted to be with him, and she told him she did not want to be with him. Defendant turned on the radio and told A.B. he wanted her to feel comfortable.

¶ 20    Defendant took about four or five photographs and asked A.B. to remove her shorts to take a bikini shot. A.B. removed her shorts, and defendant took photographs. A.B. testified that, after she put her shorts back on, she leaned back on the seat and defendant "was now over" her and put "his hand on my leg and quickly puts it inside my shorts and under my underwear and sticks his finger in my vagina." A.B. testified that defendant "was pushing inside my vagina" and she quickly pushed his hand away. The State showed A.B. a diagram of the female genitalia sex

organ and asked her to show where defendant "placed his finger inside" her vagina. A.B. circled the labia majora and labia minora.

¶ 21    Defendant asked A.B. if she wanted a massage in the vagina and if she would watch him masturbate. A.B. told him "no" and tried to exit the vehicle. Defendant blocked the door with his body. A.B. was eventually able to leave. She walked back to E.S. and they talked about modeling. Defendant walked over and told them to call him if they were interested in modeling. Defendant gave A.B. $20. A.B. and E.S. accepted defendant's offer for a ride home.

¶ 22    When E.S. and A.B. returned to A.B.'s home, they did not initially talk about what had happened because they were embarrassed. A.B. testified they felt "kind of happy" because they thought they were going to be models. A.B. sent defendant a text stating "Thank you for the money and for not touching us" because she did not want to say anything about what happened to them that night. When A.B. and E.S. started talking about the incident, they discovered that "what he did was wrong." Later that night, A.B. texted defendant, "You're a f*** perv. You stuck your finger in." The next day, A.B.'s mother called the police.

¶ 23    On cross-examination, the following exchange occurred between defense counsel and A.B. regarding defendant's conduct:

> "Q. All right. Did he penetrate your vagina?
>
> A. Yes.
>
> Q. He didn't touch your vagina.
>
> A. He did.
>
> Q. Well, which did he do?
>
> A. Can you repeat that?

Q. Which did he do? Did he touch your vagina or did he penetrate?

A. He touched it. Sorry."

When defense counsel asked A.B. about the area where she had placed a circle on the diagram of the female sex organ, A.B. testified that defendant "was leading into it" and he was "trying to push—he was pushing into—*** on the side right here."

¶ 24     Burbank police detective Robert Michelson testified that, on January 23, 2013, Michelson arrested defendant, and after he told him he was in custody for a sexual related offense, defendant stated, "[t]his is about those two girls." Michelson recovered defendant's cellular phone. Orland Park police investigator Douglas Kein testified that he recovered photographs and text messages that had been deleted from defendant's telephone. Kein could only obtain the first 50 characters from the text messages because the actual messages had been deleted. On August 3, 2012, at 3:40 p.m., defendant received a message stating: "Thank yhuu for the moneey nd for not touching us." At 7:40 p.m., defendant received a message stating, "I don't think my mom wouldn't let me be your model," and, at 9:29 p.m., he received a message stating "Yhuur a" "perv *** Yhuu stuck yhuur finger in."

¶ 25     Burbank police officer Jason Tudryn testified that, on August 7, 2012, when he interviewed E.S. and A.B., E.S. never told him that defendant pulled her arm. E.S. told him she went to defendant's vehicle voluntarily.

¶ 26     Robert Garofalo, an expert in pediatric medicine, identified a photograph of the female genitalia sex organ and described the parts, including the lips of the vagina, or the labium majora and labium minora. He testified that the parts he described collectively belonged to the female

sex organ and that the "touching or penetration of one single part, the labium majora or the labium minora, would constitute a touching of the female sex organ as a whole."

¶ 27 L.S. testified that, on August 19, 2000, when she was 18 years old, a man, whom she identified at trial as defendant, approached her outside of a grocery store and told her he was a security guard. Defendant led her to a van and pushed her inside. He took her wallet and asked her for a "b*** j***." She refused and he kissed her body, pulled down her pants, and ejaculated. L.S. had convictions for retail theft in 2001, 2003, 2004, and 2011.

¶ 28 The State entered into evidence birth certificates of E.S. and A.B. showing E.S. was born on September 1, 1998, and A.B. was born on December 11, 1998. The State entered into evidence defendant's application for a driver's license showing he was born on May 14, 1977.

¶ 29 Following argument, the jury found defendant guilty of all six counts. The court merged the aggravated criminal sexual abuse counts against E.S. (counts III and V) into the criminal sexual assault count against E.S. (count I) and merged the aggravated criminal sexual abuse counts against A.B. (counts IV and VI) into the criminal sexual assault count against A.B. (count II). The court subsequently denied defendant's motion for new trial and sentenced him to 10 years in prison on each criminal sexual assault count, to be served consecutively. The court imposed $1177 in mandatory costs.

¶ 30                                    II. ANALYSIS

¶ 31                          A. Sufficiency of the Evidence

¶ 32 Defendant contends that the State did not prove sexual penetration or that he used force or threat of force. He therefore argues that the State did not prove him guilty of the two counts of criminal sexual assault based on sexual penetration and force or the threat of force (counts I and

II) or the two counts of aggravated criminal sexual abuse based on him touching the sex organs of E.S. and A.B. with force or the threat of force (counts III and IV). Defendant does not challenge the guilty findings for the two counts of aggravated criminal sexual abuse based on him touching E.S. and A.B. for the purpose of sexual gratification or arousal (counts V and VI).

¶ 33    As an initial matter, defendant argues we should apply the *de novo* standard of review because he is only disputing whether the uncontested facts presented at trial were sufficient to prove the elements of the offense. We disagree. Defendant argues the evidence failed to establish the elements of force or sexual penetration. The State responds that a rational juror could have found from the evidence and the victims' testimony that the evidence was sufficient to establish force and sexual penetration. Because defendant is challenging whether the evidence was sufficient to establish the elements of the offenses of criminal sexual assault and aggravated criminal sexual abuse, he is challenging the sufficiency of the evidence at trial and the jury's factual findings. See *People v. Pryor*, 372 Ill. App. 3d 422, 430 (2007) ("By questioning whether the evidence proved an element of the offense of aggravated vehicular hijacking, defendant is challenging the sufficiency of the evidence at trial and the factual findings of the jury ***."). Thus, the issue is a question of fact, not law, and we will therefore not apply the *de novo* standard of review. See *id.*

¶ 34    We also note that, although the jury found defendant guilty on all counts, the trial court merged the aggravated criminal sexual abuse counts (counts III, IV, V, and VI) against each victim into the respective criminal sexual assault counts against each victim (counts I and II) and sentenced him only on the two criminal sexual assault counts. Generally, when the trial court does not impose a sentence on a judgment of guilty in a criminal case, a defendant cannot appeal

the judgment because it is not a final judgment. See *People v. Dixon*, 91 Ill. 2d 346, 352 (1982); *People v. Flores*, 128 Ill. 2d 66, 95 (1989); *In re T.G.*, 285 Ill. App. 3d 838, 845 (1996). However, an exception to this rule provides that when, as here, a defendant has properly appealed a final judgment on another offense, we may review the guilty finding even though the court did not impose sentence. See *People v. Lilly*, 56 Ill. 2d 493, 496 (1974); *In re T.G.*, 285 Ill. 2d at 845-46; *People v. Burrage*, 269 Ill. App. 3d 67, 71-72 (1994) ("Generally, absent the imposition of a sentence, a judgment of guilty in a criminal case cannot be appealed. An exception to this rule exists where, as in the case at bar, there is a proper appeal from the final judgment of another offense."); *cf. People v. Neely*, 2013 IL App (1st) 120043, ¶ 14 (noting that the exception applied in limited circumstances, *i.e.*, the court may review an unsentenced guilty finding if the count on which the defendant was sentenced was reversed and vacated). We will therefore review defendant's sufficiency of the evidence contentions with respect to the aggravated criminal sexual abuse counts based on touching E.S. and A.B.'s sex organ using force or threat of force (counts III and IV) even though the court did not impose sentence on those guilty findings.

¶ 35    When we review the sufficiency of the evidence on appeal, the question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the function of the fact finder, the jury here, to determine the credibility of the witnesses, the weight to be given their testimony, *and the inferences* to be drawn from the evidence. *People v. Herring*, 324 Ill. App. 3d 458, 464 (2001). The trier of fact need not disregard the natural inferences that flow normally from the

evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* As the reviewing court, we will not retry a defendant (*People v. Giraud*, 2011 IL App (1st) 091261, ¶ 17) or substitute our judgment for that of the fact finder on issues about the weight of the evidence or the credibility of the witnesses (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009)). We will only reverse a conviction if the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Denis*, 2018 IL App (1st) 151892, ¶ 36.

¶ 36   To prove criminal sexual assault as charged here, the State had to prove defendant used force or threat of force upon E.S. and A.B. and committed an act of sexual penetration, *i.e.*, he made any "intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person." 720 ILCS 5/11-1.20(a)(1) (West 2012); *id.* § 11-0.1. To prove aggravated criminal sexual abuse as charged here in counts III and IV, the State had to prove that defendant was over the age of 17 and, by the use or threat of force, he committed an act of sexual conduct with a victim who was between 13 and 17 years old. *Id.* § 11-1.60(c)(1)(ii). Defendant only challenges the elements of sexual penetration, which applies only to the criminal sexual abuse counts, and force or threat of force, which applies to all challenged counts.

¶ 37   Force or threat of force is defined as the use or threat of "force or violence" and includes, but is not limited to, when the accused (1) threatens to use force or violence on the victim and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat or (2) "overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.* § 11-0.1.

¶ 38    To prove force, there is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52. The force necessary to prove criminal sexual assault requires something more than the force inherent in the sexual penetration itself. *Id.* ¶ 54. When considering the evidence of force, we may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred. *People v. Hines*, 105 Ill. App. 3d 35, 37 (1982). The question of whether force or threat of force was used is best left to the trier of fact who heard the evidence and observed the demeanor of the witnesses. See *People v. Barbour*, 106 Ill. App. 3d 993, 999 (1982).

¶ 39    The evidence surrounding the conditions under which the incidents took place inside defendant's car was sufficient for the jury to reasonably conclude that defendant committed the sexual acts against A.B. and E.S. using force or threat of force. The evidence established that defendant, a 35-year-old adult man, approached A.B. and E.S., who were 13 years old, told them they could make money from modeling, and gave them his business card. He then led each of them separately to sit in the backseat of his vehicle, committed sexual acts, and blocked them when they tried to leave, from which the jury could reasonably infer that defendant overcame E.S. and A.B. by physical confinement. See *People v. Satterfield*, 195 Ill. App. 3d 1087, 1097 (1990) (where the victim was sitting in a car, the defendant leaned inside and touched her breasts, and the victim testified that there was nowhere she could move to avoid the defendant's advances, the court found that the evidence of force was sufficient, noting she was virtually "pinned" in the car and physically confined).

¶ 40    Further, E.S. testified that, when she was inside defendant's vehicle, defendant "forced" down her shorts, "pulled" her shorts down, spread her legs using both of his hands, put his thumbs under her underwear, and rubbed and "pushed in" her vagina. When E.S. tried to leave, the doors were locked and defendant blocked her with his arm. Likewise, A.B. testified that, when she was in the backseat of defendant's car, defendant was "over" her, put his hand under her underwear, and "sticks his finger" and pushed inside her vagina. When A.B. tried to leave, he blocked the door with his body. From this evidence and considering the place and conditions under which the incidents occurred, the jury could reasonably infer that, when defendant committed the sexual acts against E.S. and A.B., he overcame them by his superior strength and by physically confining them in the backseat of his vehicle.

¶ 41    Although there was no testimony about defendant's size or weight, the victims were 13-year-old girls and defendant was a 35-year-old man, who brought them separately into the backseat of his vehicle, committed sexual acts against them, and then blocked them from leaving when they tried to leave. The jury had the opportunity to view the victims and defendant at trial and could have properly considered the size disparity when viewing E.S. and A.B.'s testimony and hearing their testimony about the sexual acts and conditions under which they took place. Further, defendant asserts that there was no evidence that defendant threatened bodily injury. However, as previously discussed, force also occurs when a defendant "overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2012).

¶ 42    Accordingly, viewing the evidence in the light most favorable to, and taking all reasonable inferences in favor of, the State, we find that the evidence was sufficient for the jury

- 17 -

to reasonably conclude that defendant used force or threat of force when he committed the acts against E.S. and A.B. inside his vehicle.

¶ 43    Defendant next argues that the State failed to prove sexual penetration because it did not present evidence that any intrusion into the sex organs of E.S. or A.B. occurred. He argues the State only proved that he touched or rubbed their sex organs.

¶ 44    Counts I and II allege defendant knowingly committed an act of sexual penetration upon, respectively, E.S. and A.B., "to wit: an intrusion in that [defendant] placed part of his hand into the sex organ of [E.S. and A.B.], by the use or threat of force." Thus, sexual penetration is defined, as relevant here, as any "intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person." *Id.*; see *People v. Maggette*, 195 Ill. 2d 336, 346-47 (2001). Illinois courts have concluded that the female sex organ includes the vagina as well as the labia majora and labia minora, the outer and inner folds of skin of the external genital organs. *People v. W.T.*, 255 Ill. App. 3d 335, 347 (1994); *People v. Ikpoh*, 242 Ill. App. 3d 365, 381-83 (1993).

¶ 45    The evidence was sufficient for the jury to conclude that defendant committed an act of sexual penetration by intrusion as described in the indictment, *i.e.*, intrusion into the sex organs of E.S. and A.B.

¶ 46    E.S. testified that defendant spread her legs, put his two thumbs under her underwear, and "rubbed in the thumbs and pushed in" her vagina. On a diagram of the female genitalia sex organ, E.S. circled the labia majora as the area where defendant placed his thumbs and testified that he was "rubbing and pressing down." Similarly, A.B. testified that defendant stuck his "finger in my vagina" and he "was pushing inside my vagina." On a diagram of the female

genitalia sex organ, A.B. identified the labia minora as the area defendant placed his finger and testified he "was pushing into it." As previously stated, the female sex organ includes the labia majora and labia minora, and an expert in pediatric medicine testified that the parts of the female sex organ, including the labia majora and labia minora, collectively belonged to the female sex organ. See *W.T.*, 255 Ill. App. 3d at 347. Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient for any rational trier of fact to conclude that defendant committed an act of sexual penetration by intruding, however slight, into the sex organs of E.S. and A.B. See *People v. Hebel*, 174 Ill. App. 3d 1, 32 (1988) (finding the evidence for sexual penetration sufficient where it showed that the defendant touched the "inner surface of the victim's labium majora and her labium minora"), *abrogated on other grounds by People v. Lawson*, 163 Ill. 2d 187 (1994).

¶ 47　We note that defendant asserts that A.B. testified that defendant "touched, not penetrated" her vagina. However, A.B. also testified he stuck "his finger in my vagina," he "was pushing inside my vagina," and identified the labia minora as the area he "was pushing into." The jury heard the testimony, and it was the responsibility of the jury, not this court, to determine the credibility of the witnesses, weigh the evidence, and resolve any inconsistencies. The jury was not required to accept any possible explanation consistent with defendant's innocence and raise to reasonable doubt the possibility that A.B.'s testimony only showed that he "touched" or "rubbed" her sex organ. See *Siguenza-Brito*, 235 Ill. 2d at 229. We see no reason from the evidence presented to disturb the jury's finding.

¶ 48　Citing *Maggette*, 195 Ill. 2d 336, defendant argues that the State did not prove sexual penetration because courts have refused to allow "any rubbing to include penetration." We find

*Maggette* distinguishable. In *Maggette*, the defendant was charged with committing an act of sexual penetration in that he "rubbed the vagina of [the victim], through her clothing, with his finger." (Internal quotation marks omitted.) *Id.* at 344. The victim testified that the defendant rubbed her vaginal area, and the court concluded that the evidence was insufficient to convict him of sexual penetration because " '[m]ere touching or rubbing of a victim's sex organ or anus with a hand or finger does not prove sexual penetration and cannot, therefore, constitute criminal sexual assault.' " *Id.* at 352 (quoting *People v. Maggette*, 311 Ill. App. 3d 388, 397 (2000)).

¶ 49    Here, unlike the charging document in *Maggette*, the indictment charged defendant with sexual penetration by intrusion into A.B. and E.S.'s sex organs, which includes the labia majora and labia minora. Further, as previously discussed, the victims testified that defendant did more than just rub or touch their sex organs. E.S. testified that defendant "pushed in" her vagina and "press[ed] down" her labia majora, and A.B. testified that defendant "was pushing into" her labia minora. We are therefore unpersuaded by defendant's reliance on *Maggette*.

¶ 50    Accordingly, the evidence was sufficient for any rational trier of fact to conclude that defendant committed criminal sexual assault and aggravated criminal sexual abuse.

¶ 51                      B. Compulsory Joinder and Speedy Trial

¶ 52    Defendant contends that the State violated his statutory right to a speedy trial because it initially indicted him on February 14, 2013, and then reindicted him 742 days later on February 26, 2015, with new charges relating to E.S. that arose from the same criminal act as the original charges. He argues that the compulsory joinder principles applied to the new charges relating to E.S. and that the State was required to bring the 2015 charges within the 120-day speedy trial period applicable to the original charges. Defendant therefore argues that counsel was ineffective

for failing to move to dismiss the 2015 charges related to E.S. Defendant requests that we vacate his convictions for criminal sexual assault and aggravated criminal sexual abuse related to E.S.

¶ 53    To prove ineffective assistance of counsel, a defendant must prove that counsel's performance was deficient and the deficient performance resulted in prejudice. *People v. Phipps*, 238 Ill. 2d 54, 65 (2010). If counsel had no lawful basis to raise a speedy-trial objection then a defendant cannot establish either prong of an ineffective assistance of counsel claim. *Id.* Thus, to determine whether counsel was ineffective, we must determine whether defendant's right to a speedy trial was violated. *Id.*

¶ 54    A defendant has constitutional (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8) and statutory rights to a speedy trial (725 ILCS 5/103-5 (West 2012)). *People v. Gooden*, 189 Ill. 2d 209, 216 (2000). These provisions address similar concerns but are not coextensive. *People v. Woodrum*, 223 Ill. 2d 286, 298 (2006). Defendant only argues that his statutory right to a speedy trial was violated.

¶ 55    The speedy trial statute provides that every person in custody for an alleged offense must be "tried by the court having jurisdiction within 120 days from the date he [or she] was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2012). When a defendant is in custody, as here, the 120-day statutory period begins to run automatically from the day the defendant is taken into custody. *People v. Mayo*, 198 Ill. 2d 530, 536 (2002). If a defendant is not tried within the statutory period, charges must be dismissed and the defendant shall be discharged from custody. *Id.*; 725 ILCS 5/103-5(d) (West 2012). Any period of delay caused by a defendant tolls the speedy-trial time period. *Woodrum*, 223 Ill. 2d at 299.

¶ 56    The speedy-trial statute often interacts with the compulsory joinder statute when a defendant is charged with multiple related offenses at different times. *Gooden*, 189 Ill. 2d at 218-20; *People v. Williams*, 204 Ill. 2d 191, 198 (2003). The compulsory joinder statute requires the State to prosecute all known offenses within the jurisdiction of a single court in a single criminal case " 'if they are based on the same act.' " *People v. Hunter*, 2013 IL 114100, ¶ 10 (quoting 720 ILCS 5/3-3(b) (West 2008)). The compulsory joinder statute states: "If the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution *** if they are based on the same act." 720 ILCS 5/3-3(b) (West 2012).

¶ 57    If the State is required to bring charges in a single prosecution under the compulsory joinder statute, the time within which trial must begin on any new and additional charges is subject to the same statutory limitation that applied to the original charges. *Hunter*, 2013 IL 114100, ¶ 10. Thus, if the compulsory joinder rule applies, "the filing of a later charge does not give rise to a new, separate speedy-trial period relative to that charge." *People v. Sykes*, 2017 IL App (1st) 150023, ¶ 38. Further, delays attributable to a defendant in connection with the original charges may not be attributed to the defendant with respect to the new and additional charges. *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981). However, this rule only applies if the initial and subsequent charges are subject to compulsory joinder. *People v. Wells*, 2012 IL App (1st) 083660, ¶ 22. We review *de novo* whether charges are subject to compulsory joinder. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 28.

¶ 58    We conclude that the 2015 charges relating to E.S. were not based on the same acts as the 2013 charges and, therefore, the 2015 charges were not subject to the compulsory joinder rule.

¶ 59    On February 14, 2013, the State charged defendant with nine counts. Seven counts involved defendant's conduct towards A.B. only. The two remaining charges alleged sexual exploitation of a child and related to defendant's conduct towards E.S. Specifically, these charges alleged that he knowingly enticed, coerced, or persuaded A.B. (count VII) and E.S. (count VIII) to remove E.S.'s clothing for the purpose of sexual arousal or gratification.

¶ 60    On February 26, 2015, the State charged defendant with six counts, including three based on his conduct against A.B. and three based on his conduct against E.S. With respect to his conduct towards E.S., the State charged defendant with criminal sexual assault based on sexual penetration in that he placed part of his hand into E.S.'s sex organ by the use or threat of force (count I) and two counts of aggravated criminal sexual abuse based on touching her sex organ (counts III and V).

¶ 61    The 2013 charges based on his sexual acts against A.B. only were separate and independent acts from the 2015 charges that were based on his sexual acts against E.S. (counts I, III, and V). Further, the 2013 charges that were based on his act of persuading A.B. and E.S. to remove E.S.'s clothing for sexual gratification or arousal were separate and independent acts from the 2015 charges based on him sexually penetrating (count I) and touching E.S.'s sex organs (counts III and V). The 2015 charges relating to E.S. were therefore not based on the same acts as the 2013 charges. See *Gooden*, 189 Ill. 2d at 219-20 (where the defendant committed home invasion and sexual assault in the same incident, the court found that the charges were based on separate acts and compulsory joinder was not required, noting, "independent, overt acts that constitute different offenses are not required to be joined because they are not offenses based on the same act" (internal quotation marks omitted)). Although

defendant's conduct against E.S. and A.B. arose from a series of related acts involving E.S. and A.B., joinder is not required when multiple offenses arise from a series of related acts in the course of a single incident. See *People v. Mueller*, 109 Ill. 2d 378, 385 (1985); *People v. Baker*, 2015 IL App (5th) 110492, ¶ 81.

¶ 62    Accordingly, because the 2015 charges relating to E.S. were not based on the same acts as the 2013 charges, the compulsory joinder statute did not require the State to prosecute the offenses in the same proceeding. The 2015 charges relating to E.S. (counts I, III, and V) were therefore not subject to the same speedy trial time period as the 2013 charges. Thus, defendant's argument that counsel was ineffective for failing to file a motion to dismiss the 2015 charges relating to E.S. fails because counsel did not have a lawful basis to raise a speedy-trial objection.

¶ 63                                C. *Batson* Proceedings

¶ 64    Defendant contends the trial court erred because it did not comply with *Batson* when he made a gender-based objection to the State's peremptory challenges. He argues the trial court improperly collapsed the *Batson* proceedings into a single step because it solicited the State's explanations regarding the peremptory challenges before it determined whether defendant made a *prima facie* case. He further argues that the court erred when it both ruled that defendant did not make a *prima facie* showing and that there was no *Batson* violation without allowing him to respond. He asserts therefore that we should remand for new third-stage *Batson* proceedings. In the alternative, he asserts that, if we determine that the trial court did not reach the ultimate question of whether there was intentional discrimination under *Batson*, we should remand for new first-stage *Batson* proceedings.

¶ 65    The equal protection clause of the fourteenth amendment prohibits the State from using peremptory challenges to exclude potential jury members based on race or gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994); *Batson*, 476 U.S. 79, 89 (1986). In *Batson*, the United States Supreme Court outlined a three-step process for evaluating a defendant's challenge that the State's peremptory challenge was discriminatory. *People v. Payne*, 2015 IL App (2d) 120856, ¶ 42.

¶ 66    The trial court must first determine whether the defendant made a *prima facie* showing that the State exercised a peremptory challenge on a discriminatory basis. *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 102. If the court determines that the defendant made a *prima facie* showing, the burden shifts to the State to provide a gender-neutral explanation for striking the venireperson at issue. *People v. Hudson*, 195 Ill. 2d 117, 127 (2001). The State's explanation "must be based on a juror characteristic other than gender and cannot be pretextual." *Id.* at 127-28.

¶ 67    At the third step, the trial court must assess the State's explanations and the prosecutor's credibility and determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 128; *Crawford*, 2013 IL App (1st) 100310, ¶¶ 102, 106. The legitimacy of the State's proffered reasons is generally a factual matter for the trial court because the court is in the best position to observe the course of *voir dire* and assess the demeanor of the prospective jurors and the State. *People v. Rivera*, 307 Ill. App. 3d 821, 831 (1999). Because the trial court's finding is a credibility determination, it should be given great deference. *People v. Kitchen*, 159 Ill. 2d 1, 19 (1994). Further, in a situation when the trial court does not determine whether the defendant made a *prima facie* showing, the State offers an explanation for the peremptory

challenge, and the court rules on the ultimate question of intentional discrimination, then the issue of whether the defendant made a *prima facie* showing becomes moot. *Id.* at 18.

¶ 68    The trial court's ultimate ruling on a *Batson* challenge is entitled to great deference, and therefore, we will not reverse a trial court's ruling unless it is clearly erroneous. *Payne*, 2015 IL App (2d) 120856, ¶ 43. This means that we may not reverse unless we are left with a definite and firm conviction that a mistake has been committed. *Crawford*, 2013 IL App (1st) 100310, ¶ 103.

¶ 69    Here, defendant made a gender-based *Batson* objection after the State used its peremptory challenges on three men: Gregory Jackson, Roger Brown, and Dion Hampton. The State offered its explanation for striking the potential jurors before the trial court determined whether defendant made a *prima facie* showing under the first step in the *Batson* analysis. However, after the State offered its explanations, the court found that the State provided adequate gender-neutral reasons and that there was no basis for a gender challenge under *Batson*. Therefore, we need not determine whether defendant made a *prima facie* showing under *Batson*, as that issue becomes moot. See *Kitchen*, 159 Ill. 2d at 18. We must determine only whether the court's finding that the State's explanations for striking Jackson, Brown, and Hampton were gender neutral and valid was clearly erroneous. See *Payne*, 2015 IL App (2d) 120856, ¶ 47 (where the State offered its explanation before the trial court determined whether the defendant made a *prima facie* showing and the court determined that the State's explanation was race neutral, the reviewing court concluded that it need not address whether the defendant made a *prima facie* showing and only had to determine whether the trial court erred in finding that the State's explanation was race neutral and valid); *Kitchen*, 159 Ill. 2d at 18-23 (where the trial court did not make a finding that defendant presented a *prima facie* case, the State volunteered

its race-neutral explanation for its challenges, and the court ruled on the ultimate question of intentional discrimination, the supreme court reviewed whether the court's findings that the State's explanations were valid and race neutral were clearly erroneous).

¶ 70    We conclude that the trial court's finding that the State's explanations for excluding Jackson, Brown, and Hampton were gender neutral was not clearly erroneous. With respect to Jackson, the State explained that he had been a defendant in a murder trial of which he was found not guilty and he could have bias against the State or law enforcement as a result of that experience. Given the State's explanation that it excluded Jackson based on his own prior experience as a defendant in a murder trial, the trial court's finding that this reason was gender neutral was not clearly erroneous, as courts have found a race-neutral reason for excluding a potential juror member to be "[w]hen a member of the venireperson's family has been charged with or convicted of a crime." See *People v. Thomas*, 266 Ill. App. 3d 914, 920 (1994).

¶ 71    Further, with respect to Brown, the State attempted to strike him for cause after he did not disclose his previous criminal history when he was initially questioned. When the court denied the State's challenge for cause, the State used a peremptory challenge on him, explaining that he had been previously charged with domestic battery and solicitation of a sex act and "could be harboring some sort of bias against women." A prospective juror's criminal history and arrest record is a gender-neutral reason for excluding a prospective juror. See *Payne*, 2015 IL App (2d) 120856, ¶ 48. Thus, the trial court's finding that the State provided a valid gender-neutral reason for its challenge to Brown was not clearly erroneous.

¶ 72    With respect to Hampton, the State explained that it exercised its challenge on him because he was young and had little life experience, explaining that he lived with his parents and

recently graduated from high school. Courts have concluded that youth is a legitimate neutral reason for excluding a juror. See *People v. Mays*, 254 Ill. App. 3d 752, 765 (1993); *People v. Crockett*, 314 Ill. App. 3d 389, 400 (2000); *People v. Lovelady*, 221 Ill. App. 3d 829, 840 (1991) (concluding that the potential juror member's traits of being a student with a part-time job, not owning a residence, and living with his mother were race neutral).

¶ 73    Defendant has not provided any argument on appeal or directed this court to anything in the record to support that the State's gender-neutral explanations were pretextual. Defendant does assert that "[i]t is impossible to say now whether they were pretextual or not; the defense needed to be given an opportunity *at trial* to respond to the pretext." (Emphasis in original.) However, this court has previously concluded that, under *Batson*, the trial court is not always required to provide a defendant with an opportunity to rebut the State's argument. *Crawford*, 2013 IL App (1st) 100310, ¶ 106. Further, although the defendant should generally be permitted to offer evidence to rebut the State's explanations for its peremptory challenges, when a trial court presided over the *voir dire* and had the opportunity to observe the prospective jury members' demeanor directly, as here, it is not error if the court denies a defendant's request to rebut the State's explanation. *Id.* ¶ 107. Here, the trial court presided over the *voir dire* and the record shows that defendant never requested to rebut the State's explanations for its peremptory challenges. Thus, we are unpersuaded by defendant's argument that the court erred when it found that the State provided gender-neutral reasons for its peremptory challenges and determined there was no intentional discrimination without allowing him to respond to the State's explanations.

¶ 74    Accordingly, based on our review of the record and given that we must give the trial court great deference, we cannot find that the trial court's determination that there was no gender-based discrimination in the State's peremptory challenges was clearly erroneous.

¶ 75                               D. Conflict of Interest

¶ 76    Defendant contends the trial court erred when it allowed Grace to represent him during pretrial proceedings. It argues a *per se* conflict of interest existed because Grace had been an ASA on his prior sex offense case from 2000 and had taken a statement from him. Defendant asserts that, despite being informed of the *per se* conflict of interest, the court allowed Grace to continue to represent him during pretrial proceedings, including the plea bargaining process, and did not admonish him about the waiver or conflict. He asserts his sixth amendment rights were violated when Grace represented him for nine months before trial.

¶ 77    Initially, we note that defendant acknowledges he did not preserve his challenge by raising the issue at trial. See *People v. Banks*, 2016 IL App (1st) 131009, ¶ 71 (to preserve an issue for appeal a defendant must object at trial and raise the issue in a posttrial motion). However, the State does not argue that defendant has forfeited his argument and therefore has forfeited any forfeiture argument. See *People v. Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 (rules of waiver and forfeiture also apply to the State). We will therefore review the merits of defendant's challenge.

¶ 78    Defendant requests in his reply brief that we strike the footnote on page 28 of the State's response brief because it contains substantive material. To the extent that this footnote contains substantive material, we will not consider it. See *Lundy v. Farmers Group, Inc.*, 322 Ill. App. 3d

214, 218 (2001) (substantive material should be presented in the body of the briefs); Ill. S. Ct. R. 341(a) (eff. May 25, 2018) (discouraging the use of footnotes).

¶ 79    The sixth amendment provides that a defendant has the right to assistance of counsel in his defense. *People v. White*, 395 Ill. App. 3d 797, 824 (2009). This includes the right to effective assistance of counsel, including that an attorney's allegiance to his client must not be diluted by conflicting interests or inconsistent obligations. *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988). A defendant also has the right under the sixth amendment to counsel of choice. *White*, 395 Ill. App. 3d at 824. Thus, a defendant may waive the right to a conflict-free counsel. *People v. Washington*, 240 Ill. App. 3d 688, 699 (1992). However, a defendant must knowingly and intelligently waive this right to conflict-free counsel. See *People v. Becerril*, 307 Ill. App. 3d 518, 525 (1999). Further, a defendant's right to counsel of choice is subject to certain limitations, including a trial court's " 'substantial latitude' " to refuse to allow a defendant to waive his counsel's actual or potential conflict of interest. *People v. Ortega*, 209 Ill. 2d 354, 358 (2004) (quoting *Wheat v. United States*, 486 U.S. 153, 163 (1988)).

¶ 80    Defendant asserts we apply a *de novo* standard of review on the issue of whether the court erred when it allowed Grace to represent him during pretrial proceedings because "the issue of whether counsel labored under a *per se* conflict of interest" is subject to *de novo* review. However, defendant is not asserting a claim of ineffective assistance of counsel based on Grace's representation, and therefore, the concept of a *per se* conflict does not apply, as it only applies when a defendant asserts a claim of ineffective assistance of counsel based on his attorney's conflict. See *id.* at 364 ("the concept of a *per se* conflict applies only to cases where a defendant claims ineffective assistance of counsel due to his attorney's conflict"). In addition, the trial court

ultimately disqualified Grace from representing him. However, defendant is not asserting that the court erred when it disqualified Grace. We note that we review a trial court's ruling on its decision to disqualify an attorney from representing a defendant under the abuse of discretion standard. *People v. James*, 368 Ill. App. 3d 433, 436 (2006).

¶ 81    Instead, defendant argues the court erred when it did not disqualify Grace after the parties informed the court about the conflict of interest issue. He asserts that when the court ultimately disqualified Grace it knew the exact same facts as it did when the parties first presented the issue to the court and it "did not need nine months to make this decision; the delay only served to harm" his rights. Given that defendant is taking issue with the "delay," or time it took for the court to determine whether it should disqualify Grace from representing defendant, we will review the court's pretrial decisions regarding the conflict of interest issue under the abuse of discretion standard. See *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 847 (2010) ("Generally, decisions made by a trial judge with respect to case management are reviewed for abuse of discretion."). A trial court abuses its discretion when no reasonable person would agree with its position. *In re Marriage of Stephenson*, 2011 IL App (2d) 101214, ¶ 20.

¶ 82    We find that the court did not abuse its discretion during the period in the pretrial proceedings when it was evaluating whether to allow Grace to represent defendant. The record shows that, after the parties informed the court in August 2013 that Grace had been an ASA on defendant's case from 2000 that "could be" the subject of a motion for proof of other crimes, the court continued the case for the parties and the court to research the issue. In December 2013, defendant filed a motion to waive "the *per se* conflict," requesting that he waive "any *per se* conflict that may exist at this time." Attached to the motion, defendant filed a strongly worded

- 31 -

and comprehensive affidavit regarding the waiver, including that he acknowledged Grace's involvement on his prior case from 2000 and he understood the "perils" of Grace continuing to represent him and the possibility that Grace may need to withdraw in the future. He averred that he had "spoken extensively" with Grace about the conflict and problems that could arise from it. Defendant stated that, "[k]nowing the existence of this conflict," he still wanted Grace as his attorney and he "knowingly and intelligently" waived any conflict of interest that may occur.

¶ 83    On the December 10, 2013, court date, counsel informed the court of defendant's motion to waive "*per se* conflict," and the court continued the case for a hearing. The State had not yet filed a motion for proof of other crimes. The court did not admonish the defendant at this time to determine whether he knowingly, intelligently and voluntarily waived the conflict although the State had left open the possibility of other crimes evidence. The court continued its ruling on defendant's motion for the court to conduct further research on the issue and for the parties to review case law provided by the court.

¶ 84    When the state informed the court on May 20, 2014, that it had filed a motion for proof of other crimes the court held a hearing on June 13, 2014, on defendant's motion to waive the conflict. After the hearing the court concluded that defendant could not waive the conflict and disqualified Grace, noting that because the State filed a motion for proof of other crimes, "these cases now take on the relationship of being related" and Grace could not provide undivided loyalty, as he would be required to argue the other crimes evidence in which he was involved in the prosecution.

¶ 85    Given that the court had to evaluate the conflict of interest issue in the "murkier" pretrial context, in which defendant filed a motion to waive "any *per se* conflict that may exist" as well

as an affidavit averring he knowingly and intelligently was waiving any conflict and that the State had not filed a motion for proof of other crimes, we cannot find that the court abused its discretion during the period in the pretrial proceedings in which it allowed Grace to continue to represent defendant while it determined whether there was a conflict that defendant could waive. See *People v. Holmes*, 141 Ill. 2d 204, 223 (1990) (the court must decide the issue of whether to allow waiver of a conflict of interest " 'not with the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly' " (quoting *Wheat*, 486 U.S. at 162)).

¶ 86    Defendant asserts that the court erred because it allowed Grace to represent him during pretrial settlement negotiations when there was a *per se* conflict of interest and he had the constitutional right to loyal counsel. As previously discussed, the concept of *per se* conflict does not apply because defendant is not arguing that Grace provided ineffective assistance of counsel during any settlement negotiations. See *Ortega*, 209 Ill. 2d at 364. Further, defendant's case from 2000 in which Grace took his statement as an ASA was unrelated to the facts of this case, and defendant has not provided this court with any authority to support the proposition that Grace would have had a *per se* conflict of interest during any pretrial settlement negotiations that occurred before the State filed a motion for proof of other crimes related to that 2000 case. See *People v. Nuruddin*, 145 Ill. App. 3d 778, 782 (1986) (finding no *per se* conflict of interest existed, noting that the record did not show that "the prior prosecution of defendant by [defense counsel] was in a case which is related to this case").

¶ 87    Defendant asserts that the court did not admonish him about his waiver and that his "attempted" waiver was not made knowingly, intelligently, or voluntarily. However, the court

disqualified Grace and thus never accepted defendant's waiver. The court therefore was not required to admonish defendant or determine whether he knowingly waived his right to conflict-free representation, as it never accepted his waiver. See *People v. Coleman*, 301 Ill. App. 3d 290, 301 (1998) (the trial court must adequately inform a defendant of a conflict before it can accept any wavier of a conflict by a defendant).

¶ 88     We note that when the parties initially informed the trial court about the issue with Grace's involvement on defendant's prior case, the court told the parties that before it addressed the State's plea offer it needed to address the conflict issue, after which it continued the case for nine months. During that nine months defendant and Grace were in a legal limbo waiting to see, first, what the State would do with the prior crimes and, second, what the court would do with the waiver. The State could have decided that matter in a more timely way; the court could have forced the issue in a more timely way. This is clearly not the best practice for the State or for the court. It would have been a better practice for the court to admonish defendant from the outset of the conflict issue, require the State to make a decision about its other crimes evidence, and make the decision who could represent the defendant. The court's ultimate decision that defendant could not waive the conflict was clearly correct; it is the timing of the sequence of events that creates a question of abuse of discretion. Here, because the court had a robust and carefully worded affidavit from the defendant, before the State's decision and before the admonitions, allowing Grace to represent defendant during the interim was not a clear abuse of discretion.

¶ 89     Accordingly, given the foregoing, we cannot find that the court abused its discretion during pretrial proceedings when it allowed Grace to represent defendant while it was evaluating whether a conflict of interest existed that defendant could not waive.

¶ 90                                    E. Fines and Fees

¶ 91    Defendant contends he was improperly assessed two fees and is entitled to presentence custody credit against certain assessed "fees" that are actually considered "fines."

¶ 92    Defendant acknowledges he did not properly preserve his challenges by raising them in the trial court. See *Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 (a defendant forfeits an issue if he fails to raise an objection in the trial court and include the issue in a written postsentencing motion). He however argues that we may review his challenge to the improperly assessed fees under Illinois Supreme Court Rule 615(b)(1) and that his request for presentence custody credit not only cannot be forfeited but is reviewable under the plain error doctrine. The State does not argue that we do not have authority to review defendant's challenges. The State has therefore forfeited any forfeiture argument. See *Bridgeforth*, 2017 IL App (1st) 143637, ¶ 46 (rules of waiver and forfeiture also apply to the State). Thus, we will review defendant's claims despite forfeiture. The propriety of court-ordered fines and fees is reviewed *de novo*. *People v. Price*, 375 Ill. App. 3d 684, 697 (2007).

¶ 93    Defendant first contends, and the State correctly concedes, that the $5 electronic citation fee (705 ILCS 105/27.3e (West 2014)) was improperly assessed. The $5 electronic citation fee does not apply to felonies. *People v. Moore*, 2014 IL App (1st) 112592, ¶ 46. Defendant was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)), which is a Class 1 felony (*id.* § 11-1.20(b)(1)). We therefore vacate the $5 electronic citation fee.

¶ 94    Defendant next contends, and the State concedes, that the $25 court services (sheriff) assessment (55 ILCS 5/5-1103 (West 2014)) was improperly assessed because the offense of which he was convicted, criminal sexual assault, is not included in the statute as a qualifying

offense for the charge. However, this court has held that a defendant may be assessed the court services (sheriff) assessment under section 5-1103 when he is not convicted of the offenses listed within the statute. See *People v. Adair*, 406 Ill. App. 3d 133, 144 (2010) ("Based on the encompassing language of the statute and its clear purpose of defraying court security expenses, we are unpersuaded that the failure to list the offenses the defendant committed means he cannot be required to defray the expenses incurred by the sheriff for his court proceedings."). The court services (sheriff) charge was therefore properly assessed against defendant.

¶ 95    Defendant contends he is entitled to presentence custody credit against three fees imposed against him that are actually considered "fines" subject to presentence custody credit.

¶ 96    Under section 110-14(a) of the Code of Criminal Procedure of 1963, a defendant is entitled to a $5 credit against his fines for each day spent in presentence custody. 725 ILCS 5/110-14(a) (West 2014); *People v. Tolliver*, 363 Ill. App. 3d 94, 96 (2006). Presentence credit is only applied to fines imposed after a conviction and does not apply to other costs. *Tolliver*, 363 Ill. App. 3d at 96. A fine is considered to be part of a defendant's punishment for a conviction. *People v. Jones*, 223 Ill. 2d 569, 582 (2006). A fee is a charge for labor or services and is a "collateral consequence" of a conviction which is compensatory, not punitive. *Tolliver*, 363 Ill. App. 3d at 97. When a charge is labeled a fee, it still may be considered a fine. See *Jones*, 223 Ill. 2d at 599. To determine whether a charge is a fine or a fee, "the most important factor is whether the charge seeks to compensate the state for any costs incurred as the result of prosecuting the defendant." *People v. Graves*, 235 Ill. 2d 244, 250 (2009).

¶ 97    Defendant argues he is entitled to presentence custody credit to be applied toward the $15 state police operations fee (705 ILCS 105/27.3a(1.5) (West 2014)), $2 State's Attorney Records

Automation Fund fee (55 ILCS 5/4-2002.1(c) (West 2014)), and $50 court system fee (*id.* § 5-1101(c)(1)).

¶ 98    We agree with the parties that the $15 state police operations fee and the $50 court system fee are "fines" that must be offset by defendant's presentence custody credit. See *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31 (concluding that the state police operations fee is a fine); *People v. Ackerman*, 2014 IL App (3d) 120585, ¶ 30 (concluding that the court systems fee is a fine). However, our supreme court has concluded that the $2 State's Attorney Records Automation Fund fee is a fee, not a fine. *People v. Clark*, 2018 IL 122495, ¶ 27. Defendant is therefore not entitled to presentence credit toward the State's Attorney Records Automation Fund charge.

¶ 99    In sum, the $15 state police operations and $50 court system assessments are offset by defendant's presentence custody credit, and we vacate the $5 electronic citation fee. We order the trial court to correct the fines and fees order accordingly.

¶ 100                                III. CONCLUSION

¶ 101   For the reasons explained above, we affirm defendant's convictions and remand to the trial court for the sole purpose of correcting the fines and fees order.

¶ 102   Affirmed and remanded with directions.