2019 IL App (1st) 172006-U

No. 1-17-2006

Order filed October 29, 2019

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19281 |
| | ) | |
| ADRIAN BALLE, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse defendant's conviction for aggravated criminal sexual abuse where the evidence was insufficient to show he used force or the threat of force in committing an act of sexual conduct against the victim. Defendant's conviction for aggravated battery is affirmed.

¶ 2    Following a bench trial, defendant Adrian Balle was convicted of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2014)) and aggravated battery (720 ILCS 5/12-3.05(d)(7) (West 2014)) and sentenced to concurrent terms of 10 and 4 years' imprisonment. On

appeal, he contends the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated criminal sexual abuse. For the following reasons, we reverse defendant's conviction for aggravated criminal sexual abuse and remand the case for a resentencing hearing.

¶ 3 Defendant was charged with aggravated criminal sexual abuse and three counts of aggravated battery stemming from an incident on the victim P.R.N. that occurred at a Chicago Transit Authority (CTA) station. The aggravated criminal sexual abuse count alleged that defendant knowingly touched his hand to P.R.N.'s sex organ for the purpose of sexual arousal or gratification by the use of force or threat of force, and the criminal sexual abuse was committed during the course of an aggravated battery.[1] The aggravated battery counts alleged defendant, in committing a battery, knowingly made physical contact of an insulting or provoking nature with P.R.N. by (1) touching his hand to her buttock while he knew she was a transit passenger; (2) slapping P.R.N.'s hand while he knew she was a transit passenger; and (3) touching his hand to P.R.N.'s buttock while they were on or about a public way: the sidewalk of Chicago Avenue.

¶ 4 At trial, the victim P.R.N. testified that at about 6:45 a.m. on September 30, 2014, her father dropped her off at the CTA Brown Line station located at Franklin Street and Chicago Avenue. As P.R.N. was walking, she felt "something touch [her] butt but [she] just walked fast" without looking back. While she walked up the stairs to the platform, she felt "something between [her] legs grabbed [her]" "[l]ike between [her] butt and vagina at the same time." P.R.N. turned around and saw a man, later identified as defendant, with his hand "like going back so [she] pushed [it] back." P.R.N. asked defendant why he had touched her, but she could not recall

---

[1] Defendant was charged with a second count of aggravated criminal sexual abuse for knowingly touching his hand to P.R.N.'s sex organ for the purpose of sexual arousal or gratification, knowing that P.R.N. was unable to give knowing consent, and the criminal sexual abuse was committed during the course of an aggravated battery. The State nolled this count at trial.

his response. She felt violated, angry, sad, and was in disbelief. Defendant then put his hand on P.R.N.'s shoulder and "pushed [her] a little bit" before turning around and walking away.

¶ 5    P.R.N. walked fast up the remainder of the stairs to the CTA platform where she was approached by a CTA employee. She reported to the CTA employee that someone had touched her inappropriately and pointed out defendant, who was at a Dunkin Donuts located at the bottom of the stairs. The CTA employee called the police, who arrived within minutes. P.R.N. gave the officers a description of defendant, who had been wearing a green sweater and a backpack. An officer asked her to look down the stairway and let him know if she recognized anyone. P.R.N. saw defendant standing with another officer and recognized him as the person that grabbed her based on his green sweater and backpack.

¶ 6    After speaking with police, P.R.N. got on the train and went to school. She went to the police station later that day to give a statement and file a report. She spoke with additional officers at the station and learned there was video surveillance from the CTA platform. She watched three video clips prior to trial and testified that they accurately depicted what had occurred. The State introduced the three videos into evidence, which we have viewed, and published them for the court. P.R.N. narrated the video clips. In the first video,[2] she identified herself as wearing a black sweater with white on the sides. She also identified defendant. P.R.N. pointed out when defendant put his hands between her legs and how she subsequently ran to the top of the stairs and spoke with the CTA employee.

¶ 7    This first video shows P.R.N. walking quickly up the CTA steps with defendant, in a green sweatshirt, following closely behind her. Defendant appears to make a hand motion

---

[2] The first video was labeled "A" in the browsing menu of the DVD disc marked as Inventory #13281625.

towards P.R.N., who then turns toward defendant and pushes his hand out of the way. P.R.N. confronts defendant, and he subsequently reaches his hand out and makes contact with her. P.R.N. then runs up the CTA stairs and defendant follows her for a few steps before returning to the street. P.R.N. walks out of the camera's range and returns a few seconds later with a woman in a CTA vest. The video shows P.R.N. talking to the CTA employee and pointing down the stairs.

¶ 8    P.R.N. testified that the second clip[3] showed "the other side of the stairs, the street," when she first felt someone touch her buttocks. She again identified herself and defendant, who was behind her in the video wearing a green sweater and backpack. This second video shows P.R.N. walking on the street toward the CTA stairs with defendant following closely behind her.

¶ 9    Finally, P.R.N. narrated the third video clip,[4] which depicted another angle of the CTA stairs. That clip shows defendant make a hand motion towards P.R.N.'s buttocks from behind, though any physical contact is not visible due to the angle of the video. P.R.N. observed that in this video, defendant was standing directly behind her with his arm extended.

¶ 10    The third video clip shows P.R.N. walking quickly up the stairs. Defendant follows closely behind her and extends his arm toward her buttocks area. P.R.N. turned around and confronted him for a few seconds before running up the rest of the stairs. Defendant is again shown following her up a few steps and then returning down the stairs to the street.

_____

[3] The second video was labeled "B" in the browsing menu of the DVD disc marked as Inventory #13281625.

[4] The third video was labeled "C" in the browsing menu of the DVD disc marked as Inventory #13281625.

¶ 11    P.R.N. testified she did not know defendant and did not consent to talking to him. She clarified that he had grabbed her buttocks on the sidewalk and then her buttocks and vagina on the stairs to the CTA platform.

¶ 12    On cross-examination, P.R.N. testified that when she first felt something touch her buttocks on the sidewalk, she did not realize someone had touched her and believed it was her backpack. However, that touch had "made [her] walk faster somehow," and she walked "a little faster" up the stairs. Defendant touched her for "one, two seconds," which was unexpected. She immediately turned around and brushed his hand away. The CTA employee approached P.R.N. because she was "near tears." P.R.N. told the officer at the scene that defendant had put his hands between her legs, but she acknowledged she did not use the word "vagina" at that time. She briefly spoke with the responding officers, but gave a more detailed account of what occurred later at the station. There, P.R.N. told a detective that defendant had grabbed her "butt" on the sidewalk and her "butt and vagina" on the stairs. P.R.N.'s later account was more specific because a female officer was present, which made her feel more comfortable.

¶ 13    Chicago police officer Mark Figueroa testified that on the day in question he was on duty with his partners Daniel Linnane and Tim Kinsella. The officers responded to a flash message regarding the incident. As they exited their vehicle at the scene, they received a second flash message that noted "something to do with a lime green sweatshirt and he had just gone into the Dunkin Donuts." At the scene, there were stairs from the street to the CTA platform and a Dunkin Donuts at the bottom of the stairs. The officers entered the Dunkin Donuts and Figueroa observed defendant, who matched the description from the flash message. They placed him in protective custody and escorted him out of the store. Figueroa stayed with defendant, while one

of his partners went to speak with P.R.N., who positively identified defendant as the offender. P.R.N. briefly explained that defendant had grabbed her "buttocks area." Figueroa wrote a general offense case report, which was a preliminary report of the incident. He learned the CTA had video surveillance and obtained a copy of the video, which was later inventoried by Detective Thomas McGuire. He did not recall whether P.R.N. reported that defendant had grabbed her vagina.

¶ 14     Sergeant Thomas McGuire testified that he was the detective assigned to P.R.N.'s case on the day of the incident. He learned the offender was in custody and spoke with the responding officers and P.R.N., who recounted what had occurred. McGuire took general progress report (GPR) notes during his interview with P.R.N. and recalled that she reported "she was grabbed from behind and he grabbed her buttocks and vagina." McGuire did not include every detail in his GPR notes; they were intended to refresh his memory later. He completed a closing supplemental report that contained a more detailed account of his interview with witnesses. The report included that P.R.N. reported someone grabbed her buttocks and vagina from behind. McGuire obtained copies of the surveillance video and still photographs from the video from the CTA. He identified the still photographs, which showed two different angles of the victim and defendant walking up the stairs, and the pair outside the stairwell on Chicago and Franklin.

¶ 15     The parties stipulated that if called, CTA employee Denise Szaflarski would testify that, while she was working at 6:45 a.m. on September 30, 2014, a CTA passenger, who was visibly upset, flagged her down and reported that an individual who had just grabbed her was walking into Dunkin Donuts. The passenger described the individual as a black man wearing a lime green

sweatshirt. Szaflarski immediately called the police. The incident was captured on video and a true and accurate copy of the video was given to Officer Linnane.

¶ 16    The court previously allowed the State to introduce other-crimes evidence. I.T.R. testified that on December 12, 1986, she was living in Chicago and went to her co-worker Diane's house. I.T.R. believed Diane lived at 3600 Flournoy Street. When she arrived at that address, a man she identified as defendant answered the door. I.T.R. asked to speak with Diane, but defendant told her Diane was out and would be home shortly. I.T.R. waited in her car for 10 minutes and then returned to the house, though she could not recall whether she walked back to the door on her own or if defendant beckoned her back to the house. When she entered the house, defendant started rubbing her back and she realized "right away" that she was in the wrong place. I.T.R. was "somehow" "just on the floor" and struggling, as defendant rubbed her breast. I.T.R. grabbed her purse and fled the house. Once in her car, she drove to the police station. The police drove I.T.R. back to the Flournoy residence, where her earring was found on the floor.

¶ 17    Defendant testified that he was homeless at the time he was arrested in this case. On the day of the incident, he was near the Brown Line and did not have anywhere to go. He acknowledged that he was wearing a backpack and carrying a Trader Joe's bag. While walking up the stairs to the CTA platform, defendant got into an "altercation" with a woman because his "hand kind of, you know, brushed up against her buttocks and everything." The woman turned around and noticed him. Defendant initially denied touching her intentionally, but later testified, "what the situation with me being kind of distorted at the time, I just -- I just didn't have anywhere. I was just tired of my circumstances." He denied touching P.R.N.'s vagina. When the

police entered Dunkin Donuts, defendant was "tired of [his] circumstances. There was no need to run. [He] was just tired."

¶ 18    On cross-examination, defendant admitted it was "true" that his hand touched P.R.N.'s buttocks. He recognized the Chicago Brown Line station in the CTA video surveillance and identified himself following closely behind the victim. He also admitted to "swiping" P.R.N.'s hand and acknowledged that the video showed his hand reaching toward her buttocks.

¶ 19    During closing arguments, the State argued, "[Defendant] grabs people for sexual gratification and he doesn't care that he's doing it by force." The State further argued the aggravated battery that enhanced the criminal sexual abuse count was defendant "swiping" P.R.N.'s hand after she confronted him for touching her buttocks and vagina. In response to defense counsel's argument that the State used the same contact (touching P.R.N.'s vagina) to "upgrade the [aggravated criminal sexual abuse] felony in two different ways," the State clarified:

> "The State is not using the same conduct or same act to make this a felony. He touched her vagina. And as we went over, the defendant admitted himself on that video, you saw him swiping her hand, committing another battery. That is a different act in the course of conduct in the course of touching her vagina which is the criminal sexual abuse."

¶ 20    The court found defendant guilty of three counts of aggravated battery and aggravated criminal sexual abuse for touching his hand to P.R.N.'s vagina for the purpose of his own sexual arousal or gratification by the use of force or threat of force during the course of committing an aggravated battery. The court specified that it found the evidence established defendant

committed another felony in the course of committing criminal sexual abuse based on his "slapping away the complaining witness's hand."

¶ 21    The court subsequently denied defendant's motion for acquittal, or in the alternative, a new trial, finding the evidence against him was extensive. The court found P.R.N. testified credibly and that the video footage corroborated her testimony.

¶ 22    Following a hearing, the court sentenced defendant as a Class X offender based on his prior criminal history to 10 years' imprisonment for aggravated criminal sexual abuse. The court merged the three counts of aggravated battery and sentenced defendant to a concurrent four-year term for that offense.

¶ 23    On appeal, defendant contends that the State failed to prove he committed aggravated sexual abuse because there was no evidence that he used force or the threat of force. He does not contest his conviction for aggravated battery.

¶ 24    Initially, defendant contends that the facts are undisputed and therefore *de novo* review applies to determine whether sufficient evidence supports his conviction. We disagree. Although the facts are undisputed, defendant contests the inferences drawn from the evidence, thereby creating questions of fact. See *People v. Lattimore*, 2011 IL App (1st) 093238 ¶35 ("If divergent inferences could be drawn from undisputed facts, a question of fact remains."); see also *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 33 (declining to review a challenge to the sufficiency of the evidence *de novo* where the defendant alleged an element of the offense was unproved).

¶ 25    When reviewing a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis

omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010).

¶ 26    To prove criminal sexual abuse, the State was required to show defendant committed "an act of sexual conduct by the use of force or threat of force." 720 ILCS 5/11-1.50(a)(1) (West 2014). Sexual conduct is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1. To establish aggravated criminal sexual abuse as charged here, the State was required to prove that defendant committed criminal sexual abuse during the course of committing or attempting to commit another felony, namely, aggravated battery. *Id.* § 11-1.60(a)(6) (West 2014). A person commits battery when he or she "knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual." *Id.* § 12-3(a). A person commits aggravated battery by committing battery while on or about a public way (*id.* § 12-3.05(c)), or by committing battery with knowledge that the individual battered is a "transit passenger" (*id.* § 12-3.05(c), (d)(7)).

¶ 27    In this court, defendant does not dispute that he committed an act of sexual conduct by grabbing P.R.N. Rather, he challenges only the element of force or threat of force.

¶ 28 Force or threat of force is defined in the Criminal Code of 2012 as the use or threat of "force or violence," and includes, but is not limited to, when the accused (1) threatens to use force or violence on the victim and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat or (2) "overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2014). There is no precise standard establishing the requisite amount of force and each case must be considered on its own facts. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 (citing *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52). The force necessary to prove the offense requires something more than the force inherent in the sexual touching itself. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 (using the statutory definition of force in considering the sufficiency of both sexual assault and sexual abuse convictions). When evaluating whether force was used, we may consider the size and strength of the defendant and the victim, along with the place and conditions under which the incident occurred. *Id.* (citing *People v. Hines*, 105 Ill. App. 3d 35, 37 (1982)).

¶ 29 Here, we find the evidence was insufficient to show defendant used force or a threat of force when he committed an act of sexual conduct against P.R.N. The evidence established defendant closely followed P.R.N. up the stairs to the CTA platform. As he followed her, defendant extended his arm and grabbed P.R.N.'s buttocks and vagina. P.R.N. immediately turned around, pushed defendant's hand away, and the two spoke for a few seconds before defendant pushed P.R.N.'s arm, or swiped her hand, and she fled up the remaining stairs. Although the evidence clearly established defendant committed an act of sexual conduct, *i.e.*, grabbed P.R.N.'s vagina, it does not show he used force or the threat of force within the meaning

of the statute. There was no evidence showing he threatened her or overcame her using physical restraint or confinement. P.R.N. did not testify that defendant verbally threatened her or that she was trapped or restrained in the stairwell by defendant during the encounter. While there is no set standard for the force necessary to prove criminal sexual abuse, in this case, there was no evidence that established defendant used any force or the threat of force. See *Gonzalez*, 2019 IL App (1st) 152760, ¶ 39 (force proved where the defendant separately led two teenage girls to his car, committed sexual acts against them, and blocked them when they attempted to exit); *People v. Satterfield*, 195 Ill. App. 3d 1087, 1097 (1990) (finding force was established where the victim was sitting in a car and the defendant leaned inside, touched her breasts, and the victim testified she could not move to avoid defendant's acts).

¶ 30    In reaching this conclusion, we are mindful that whether force or threat of force was used is a question for the trier of fact, who heard the evidence and observed the demeanor of the witnesses. See *People v. Barbour*, 106 Ill. App. 3d 993, 999 (1982). However, this court will reverse a criminal conviction when the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. In this case, the trial court did not make a specific finding regarding the use of force and, given the dearth of evidence on that element, and having carefully reviewed the videos of the event, we cannot say that the State fulfilled its obligation to prove each element of the offense beyond a reasonable doubt.

¶ 31    It is clear that the State did prove sexual contact and aggravated battery, but without proving the use or threat of force, the aggravated criminal sexual abuse count fails.

¶ 32    The State nevertheless argues that "common sense dictates that in order to get his hand not only in between P.N.R.'s legs but positioned forward enough to touch her vagina, defendant

had to exert force to basically pry open her legs from the back. This was force." However, as mentioned, and as the State acknowledges, the force necessary to establish criminal sexual abuse must be more than the force inherent in the act of the sexual conduct—in this case, grabbing P.R.N's vagina. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38 (The force necessary to prove the offense requires something more than the force inherent in the sexual touching).

¶ 33    In sum, because the evidence was insufficient to prove defendant used force or a threat of force, we reverse and vacate his conviction for aggravated criminal sexual abuse. Defendant's conviction for aggravated battery remains.

¶ 34    For the foregoing reasons, we affirm defendant's conviction for aggravated battery, and reverse and vacate defendant's conviction for aggravated criminal sexual abuse. Because defendant's sentence was largely based on his now-vacated conviction of aggravated criminal sexual abuse, we remand the case for a resentencing hearing on the remaining aggravated battery conviction. See *People v. Williams*, 215 Ill. App. 3d 800, 803-04, 816 (1991) (remanding for a resentencing hearing, where the reviewing court vacated two of the three counts for which the defendant was sentenced).

¶ 35    Affirmed in part; reversed and vacated in part; and remanded with directions.