2021 IL App (1st) 190176-U

No. 1-19-0176

Order filed June 1, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 5824 |
| | ) | |
| LUIS LUCERO, | ) | Honorable |
| | ) | Joseph Michael Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for criminal sexual abuse is affirmed where the evidence was sufficient to show he used force or the threat of force in committing an act of sexual conduct.

¶ 2    Following a jury trial, defendant Luis Lucero was found guilty of criminal sexual abuse and sentenced to 30 months' imprisonment. On appeal, defendant argues his conviction should be vacated because the State failed to prove beyond a reasonable doubt that he used force or threat of force during the act of sexual conduct. For the following reasons, we affirm.

¶ 3 Defendant was charged in a 15-count indictment with offenses related to incidents between himself and A.S. on March 23, 2017. The State proceeded on three counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)) and one count of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2016)).[1] The criminal sexual assault counts alleged that defendant knowingly committed an act of sexual penetration upon A.S. in that he inserted his finger into her sex organ, made contact between his penis and her sex organ, and made contact between his penis and her anus, by the use or threat of force. The criminal sexual abuse count alleged that defendant committed an act of sexual conduct upon A.S. in that he made contact between his hand and her breast for the purpose of sexual gratification or arousal, by the use or threat of force.

¶ 4 A.S., who was 26 years old at the time of trial, testified that she called defendant her uncle. He had been married to her aunt since A.S. was a baby, but they later divorced. Defendant owned a cleaning company where A.S. worked for several months in 2017. On March 23, 2017, A.S. and defendant were hired to clean three houses. At the second house, which A.S. testified she had never been to before and could not remember the address of, the homeowners were absent. As A.S. looked at a map on the wall in the house's "computer room," defendant came behind her, wrapped his arms around her so that her arms were "pinned" to her sides, and touched her breasts. A.S. asked defendant what he was doing, covered her breasts with her arms, and jerked backwards to push him away, shoving defendant a little bit. A.S. stepped away from defendant because she was uncomfortable and scared. She continued to look at the map and defendant then reached from

---

[1] The trial court granted defendant's motion to dismiss three counts of sexual relations within families because, at the time of the offense, defendant was no longer married to A.S.'s aunt.

behind her and touched her breasts again, this time under her shirt and bra. A.S. clasped her arms in front of her chest. She did not know what to do and stood speechless.

¶ 5    Afterwards, defendant and A.S. went to the basement because he said she needed to finish cleaning there. A.S. began dusting a basement wall when defendant grabbed her side, pulled down her pants and underwear from behind, touched her buttocks and vagina with his hands, inserted his fingers into her vagina, and then inserted his penis into her anus and vagina. A.S. "froze" because she was scared. Defendant ejaculated into a rag and then asked if A.S. was hungry. Defendant and A.S. then went to the third house, where the homeowners were present. They cleaned the house and defendant drove A.S. home.

¶ 6    Once home, A.S. went to the bathroom and noticed blood in her underwear and that her anus was bleeding. After showering, A.S. contacted two friends and asked them to come over because she "needed someone." When they arrived, A.S. told them she was raped and they spent the night with her. A.S.'s boyfriend came home later that night and she told him that she was raped.

¶ 7    The next morning, defendant knocked on A.S.'s door but she did not answer him or go to work that day. After defendant left, A.S. went to the police department, bringing her underwear from the day before. From there she was sent to the hospital, where they administered a sexual assault kit. A.S. testified that at no time on March 23, 2017, did she want defendant to touch her.

¶ 8    On cross-examination, A.S. testified she did not remember if she leaned back and kissed defendant when he touched her breasts, how long the basement encounter lasted, or if she had any bruises, scratches, or wounds following the incident. A.S. also could not remember if, when defendant dropped her off, she invited him inside to look at stains on her carpet. Further, A.S.

could not say if defendant actually entered her apartment that day, or if she bent over with her back to him to show him the stains.

¶ 9       On redirect examination, A.S. testified that after that day she felt horrible and disgusted. A.S.'s relationship with her boyfriend later ended because she did not want him to touch her anymore and was scared of the incident recurring. She also testified that she did not leave her home for a year.

¶ 10      Brittany Dunn testified that on March 23, 2017, A.S. contacted her stating that she had been raped by her uncle, and asked her and Amanda Steffy to spend the night. When Brittany and Amanda arrived at A.S.'s apartment, A.S. looked horrible with a red face from crying. Dunn stayed with A.S. for two or three days.

¶ 11      A.S.'s former boyfriend, Manuel Alonso, testified that he met A.S. in high school where she was enrolled in "special-need" classes. Alonso and A.S. lived together in March 2017. When Alonso returned home on March 24, 2017, A.S. was crying and told him that her uncle "sexually abused" her. Alonso took her to speak to police the next day. After March 24, 2017, A.S. changed from social and confident to depressed, scared, and suicidal. Alonso and A.S.'s physical relationship also changed because she would not let him touch her. On cross-examination, Alonso clarified that, in high school, A.S. was in classes for students with mental or learning disabilities.

¶ 12      Streamwood police detective and evidence technician Tim Breslin testified that on March 24, 2017, he was assigned to a sexual assault investigation. Breslin spoke to A.S at the police station and she gave him underwear she wore during the alleged assault. He photographed the underwear, which had several red stains, and determined they were positive for blood.

¶ 13    Streamwood police officer and evidence technician Homfeldt[2] testified that on March 24, 2017, he was assigned to photograph a house on Foxglove Court. Homfeldt observed an office area in the house with a United States map on the wall. On cross-examination, Homfeldt testified that he did not observe any blood or bodily fluids in the residence.

¶ 14    Jennifer Paulek-Bieszczad, a registered nurse at St. Alexius Medical Center, testified that she treated A.S. for sexual assault on March 24, 2017, and administered a sexual assault kit. A.S. told Paulek-Bieszczad that while in a basement, her attacker touched her breasts under her shirt, pulled down her pants and underwear, and then inserted his penis into her vagina and anus. A.S.'s vaginal and anal exams came back normal. Paulek-Bieszczad explained that normal exams can be consistent with sexual assault. Paulek-Bieszczad also collected swabs from A.S.'s vagina, anus, and neck, but the fact that A.S. had showered could have influenced the results. Paulek-Bieszczad recalled that she thought A.S. was "special" or "a little slow." On cross-examination, Paulek-Bieszczad testified that she did not notice any blood during an internal rectal swab.

¶ 15    The State entered a written stipulation that, if called, a forensic scientist would testify she examined A.S.'s underwear and noted blood-like stains, but that no semen was indicated. A second written stipulation provided that another forensic scientist would testify that male DNA was not detected in the anal and vaginal swabs from A.S.'s sexual assault kit, but it was indicated in A.S.'s neck swabs. The DNA from the neck swabs was not suitable for further testing.

¶ 16    The State entered several exhibits, including photographs of the house where the incident occurred and the underwear A.S. gave to police.

---

[2] Homfeldt's first name does not appear in the report of proceedings.

¶ 17    Defendant, who was 61 years old at the time of trial, testified through an interpreter that while cleaning the Foxglove Court house with A.S. on March 23, 2017, A.S. called him over to help her find Ecuador on a map. When defendant reached from behind her to point it out, A.S. leaned back and began moving her hips against him and kissing him. Defendant testified that when A.S. leaned on him she was "falling" so he "hugged her because [he] was surprised." When asked if he touched her breasts, defendant said, "I was holding her because she was going to fall maybe, so yes." Defendant admitted he "responded" to A.S.'s kiss.

¶ 18    Defendant asked A.S. if she wanted "to do it," and she nodded her head in affirmation. Defendant told her they were leaving and that he was going to turn off the lights in the basement. Defendant denied instructing A.S. to go to the basement, but she followed him there. After turning off the lights, defendant found A.S. by the basement stairs bent down facing the wall with her pants halfway pulled down. Defendant pulled her pants down further, touched her, and had sex with her. He was not sure whether he penetrated her vagina or anus because he "wasn't paying attention." A.S. did not push him away, stiffen up, or verbally object. The encounter lasted less than a minute. After he ejaculated into a rag, defendant asked A.S. if she was okay, and she said she was.

¶ 19    On the drive home after cleaning the next house, defendant invited A.S. to eat, and she accepted. Defendant then remembered that he had a haircut appointment. Defendant testified that A.S. seemed bothered by him cancelling their plans to eat. When they arrived at A.S.'s home, A.S. told defendant that her boyfriend was not home and asked defendant to come upstairs to look at her carpet that she wanted cleaned. While showing defendant the carpet stains and a stain in her toilet, A.S. "provok[ed]" him by facing away from him and bending over. Defendant then left. On

cross-examination, defendant testified that A.S. was "ready" for him, "desperate" to have him, and enjoyed having sex with him.

¶ 20    Des Plaines police officer Katherine Derfler testified that on March 24, 2017, A.S. reported to the Des Plaines police department that her uncle "inappropriately touched her" the day before while she cleaned a basement by approaching her from behind and rubbing her breasts. A.S. reported that she told defendant she felt uncomfortable. Defendant then told A.S. to dust a map and, when A.S. obeyed, he got behind her and penetrated her vagina and anus with his penis. A.S. further reported that the incident lasted for approximately an hour, during which she stood still in shock, and after which she told defendant she did not feel comfortable. A.S. did not tell Derfler that defendant threatened, hit, or shoved her. After learning the incident occurred in Streamwood, Derfler directed A.S. to the Streamwood police department. On cross-examination, Derfler testified that A.S. told her that defendant had a "tight grip" on her and she was not able to move.

¶ 21    Streamwood police officer Steven Sachen testified that on March 24, 2017, A.S. told him that while cleaning a house, defendant asked her to dust spider webs in front of a large map in the basement. Defendant came behind her, grabbed her breasts under her shirt, and then pulled down her pants and underwear. A.S. said she felt uncomfortable and "just stood there" in shock without saying anything to defendant. A.S. did not mention that defendant inserted his fingers into her, but she did mention that defendant inserted his penis into her anus and vagina. A.S. said that the encounter lasted for about an hour. On cross-examination, Sachen testified that it took some time for A.S. to find the residence where the incident occurred. On redirect examination, Sachen testified that A.S. did not tell him that defendant threatened her.

¶ 22    Defendant entered a stipulation that, if called, Streamwood police detective Mary Kosartes would testify she interviewed A.S. at the St. Alexius Medical Center on March 24, 2017, and A.S. was able to identify the Foxglove Court residence as where the incident occurred.

¶ 23    In rebuttal, the State entered a certified statement of conviction from 2015 for defendant for driving on a revoked or suspended license.

¶ 24    The jury was instructed that in order to sustain the charge of criminal sexual abuse, the State had to prove that (1) defendant committed an act of sexual conduct upon A.S., (2) the act of sexual conduct was committed by force or threat of force, and (3) A.S. did not consent to the act of sexual conduct. The jury was also instructed that "force or threat of force" means "the use of force or violence or the threat of force or violence including but not limited to when the accused has overcome the victim by use of superior strength and physical restraint."

¶ 25    During deliberations, the jury submitted the following question to the trial court: "Can force be viewed as including the power of persuasion due to hierarchal position or is force solely a physical manifestation, akin to Bill Clinton influencing Monica Lewinsky?" By agreement of the parties, the court responded to the jury that it had a definition of force and to follow the instructions.

¶ 26    The jury found defendant guilty of criminal sexual abuse based on contact between defendant's hand and A.S.'s breast, but was unable to render a verdict on the criminal sexual assault charges. The trial court declared a mistrial as to the criminal sexual assault charges, and the State later *nol prossed* them.

¶ 27    Defendant filed a motion for judgment notwithstanding the verdict, arguing *inter alia* that A.S. gave conflicting versions of the incident to police, medical personnel, and at trial; she did not

remember if she invited the conduct; and defendant's unimpeached testimony showed the contact with A.S.'s breasts was incidental and unintentional. At the hearing on the motion, defendant argued there was little to no physical evidence of defendant's guilt, and that A.S.'s testimony was not credible. He specifically pointed to discrepancies between her trial testimony and prior statements about whether she vocalized that she was uncomfortable when defendant touched her breasts, and the 131 times during cross-examination in which she answered she did not know or did not remember who she told, what she told, what happened, and what defendant did.

¶ 28    The trial court denied defendant's motion, noting that although A.S. was impeached to some degree, the inconsistencies in her story could be explained by her "difficulties communicating." It stated A.S. clearly had some learning difficulties, which might render her confused and unable to understand what was happening. It was clear to the court that A.S. "shut down" during parts of her testimony, as she had done during the offense, but overall the evidence was sufficient for the jury to find defendant guilty of criminal sexual abuse.

¶ 29    Following a hearing, the trial court sentenced defendant to 30 months' imprisonment.

¶ 30    On appeal, defendant argues his conviction should be vacated because the State failed to prove beyond a reasonable doubt that he used force or threat of force when he touched A.S.'s breasts.

¶ 31    We initially note that we disagree with defendant's contention that the facts are not in dispute and thus the issue on appeal is subject to *de novo* review. See *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 33 (finding that, because the defendant challenged whether the evidence was sufficient to establish the elements of the offenses of which he was convicted, he was "challenging the sufficiency of the evidence at trial and the jury's factual findings" and the issue was thus not a

question of law subject to *de novo* review). Rather, when we review this challenge to the sufficiency of the evidence, we must determine whether, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.' " (Emphasis in original.) *Id.* ¶ 35 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 32    Under the appropriate standard of review, the trier of fact is tasked with resolving conflicts in testimony, weighing the evidence, and drawing reasonable inferences from the facts. *People v. Howery*, 178 Ill. 2d 1, 38 (1997). Our function is not to retry the defendant (*People v. Lloyd*, 2013 IL 113510, ¶ 42), and we will not substitute our judgment for that of the trier of fact on those evidentiary and credibility issues (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009)). We may not reverse a conviction "unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." (Internal quotation marks omitted.) *Lloyd*, 2013 IL 113510, ¶ 42.

¶ 33    To prove defendant guilty of criminal sexual abuse, the State had to prove he committed "an act of sexual conduct by the use of force or threat of force." 720 ILCS 5/11-1.50(a)(1) (West 2016). Here, defendant solely argues the State failed to establish that his sexual conduct of touching A.S.'s breast was accomplished "by the use of force or threat of force."

¶ 34    The term "force or threat of force" means the use of force or violence or the threat of force or violence, and includes, but is not limited to, "when the accused threatens to use force or violence on the victim ***, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat," or "when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2016).

There is no precise standard establishing the amount of force the State must prove, and each case must be considered on its own facts. *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. However, the force necessary for the offense requires something more than the force inherent in the sexual conduct itself. *Id.* When evaluating whether there was sufficient evidence of force, "we may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred." *Id.* A conviction based on use of force cannot be sustained by establishing only that the victim did not consent to the act of sexual conduct. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 52.

¶ 35    In this case, viewing the evidence in the light most favorable to the State and taking all inferences in favor of the State as we must, we find that a rational trier of fact could have found, beyond a reasonable doubt, that defendant used force or the threat of force in committing the act of sexual conduct on A.S. A.S., who has a learning disability and was perceived by a hospital worker as "special" or "slow," had known defendant since she was a baby and considered him to be her uncle as well as her boss. While A.S. was working with defendant, he came behind her, wrapped his arms around her, pinned her arms down against her sides, and then rubbed her breasts, from which a reasonable jury could conclude he physically restrained A.S. in order to facilitate his act of sexual conduct.

¶ 36    Then, after A.S. escaped defendant's grasp by pushing away from him and stepping away, defendant again reached from behind her and touched her breasts, this time under her shirt and bra, despite her rejection of his earlier conduct. A.S.'s testimony is ample to show defendant, the man she had known since she was a baby, overpowered her clear desire to escape him in order to commit his act of sexual conduct. See 720 ILCS 5/11-0.1 (West 2016) (evidence of force includes when a

defendant "overcomes the victim by use of superior strength or size, physical restraint, or physical confinement"). We find the jury could reasonably conclude defendant used force during the act of sexual conduct.

¶ 37    Defendant argues that a threat, by its very nature, must be communicated to the victim by word or deed, and the evidence reveals defendant made or communicated no threats to A.S., that he merely reached around A.S. from behind and touched her breasts without violence, force or threat of same. However, the jury heard the evidence and found defendant did touch A.S.'s breasts by use of force or threat of force. "The question of whether force or threat of force was used is best left to the trier of fact who heard the evidence and observed the demeanor of the witnesses." *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. The jury was not required to "disregard the natural inferences that flow normally from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* ¶ 35. Here, where the evidence shows a young woman with learning disabilities had her arms pinned to her sides by the man she considered her uncle so that he could touch her breasts, and that man then touched them again after she had pushed him away, the jury could reasonably infer defendant committed the acts of sexual conduct by use of force or threat of force, and we defer to its finding.

¶ 38    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 39    Affirmed.