2023 IL App (1st) 211537-U

No. 1-21-1537

Filed May 25, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 18 CR 12291 |
| | ) | |
| EMMANUEL BOADU, | ) | Honorable |
| | ) | Timothy J. Chambers, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1       *Held*: Evidence was sufficient to prove defendant guilty of criminal sexual abuse beyond a reasonable doubt. The trial court did not abuse its discretion by denying defendant's request for specific performance of a plea offer as a remedy for the State's inadvertent discovery violation.

¶ 2       Resolution of this appeal is guided by the adage "no means no." Defendant, Emmanuel Boadu, was charged with various sex offenses in a seven-count indictment stemming from an incident with D.D., a female college student: two counts of criminal sexual assault, one count of attempted criminal sexual assault, and four counts of criminal sexual abuse. Following a bench trial, defendant was convicted of three counts of criminal sexual abuse over his affirmative defense

of consent. The trial court merged the counts and sentenced defendant to two years' felony probation, along with sex offender evaluation and treatment, sex offender registration, STD/HIV testing, and a two-year civil no contact order.

¶ 3       On appeal, defendant contends that the evidence was insufficient to prove him guilty of criminal sexual abuse beyond a reasonable doubt. Specifically, he argues the State failed to prove force was used or threatened or that D.D. did not consent. Separately, defendant contends the trial court erred in denying his request for specific performance of the State's plea offer to simple battery, a Class A misdemeanor, that he rejected before trial, as a remedy for the State's failure to disclose a recorded interview with D.D. in discovery. For the reasons that follow, we affirm.[1]

¶ 4       I. Background

¶ 5       The evidence adduced at trial consisted of the testimony of the victim, D.D., admitted exhibits, and stipulations. D.D. testified as follows. D.D. was participating in a summer academic program at Northwestern University while on break from her studies at Baylor University in Texas. Defendant and D.D. met by chance while walking in downtown Chicago. Shortly after, they began communicating by text messages and telephone calls. They went on a few dates and one evening, D.D. invited defendant to meet at her dormitory on the Northwestern University campus in Evanston.

¶ 6       Defendant arrived at the dorm after midnight on July 28, 2018. He left his wallet and keys in D.D.'s room before the two went to a common area where they watched a movie, talked, and drank wine. After a while, defendant told D.D. that he was tired, and they returned to her dorm room. D.D. expected the defendant to retrieve his wallet and keys and then be on his way. Instead, once there, defendant laid down on D.D.'s twin-sized bed. At this time, D.D. decided to record her

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

interaction with defendant. She activated an audio recording application she had downloaded to her iPad. D.D. testified that she did this as a "precaution" because she had never had a man in her bedroom and her mother had advised her to do this to protect herself. The recording was played in court. It and a transcript of the discernable dialogue were admitted into evidence and included in the record before us. At trial, the court would pause the recording and allow D.D. to testify as to what was occurring during various portions.

¶ 7        D.D. asked defendant what he was doing. Defendant said he wanted to spend the night, but D.D. refused. D.D. left to use the bathroom and, when she returned, perceived that defendant was pretending to be asleep. D.D. tickled defendant to "wake him up out of his fake slumber." Defendant tried to persuade D.D. to let him stay overnight. D.D. refused again and told defendant that it was "too early [in their relationship]," and reminded him that they "had agreed to take things slow." The transcript shows that D.D. told defendant that he could not stay, said that he had to go home, or used words to similar effect at least 10 times by this point.

¶ 8         "Things escalated quickly" from there. Defendant started kissing her and ignored her requests to stop. Defendant started groping and kissing her breast. D.D. tried to remove his hand. Defendant told her to stop. When she continued to resist, defendant tightened his grip and became more forceful. Defendant was on top of D.D. by this point. She felt overwhelmed and scared. She could not move from underneath the defendant. As she tried to push his arm away, he told her to stop.

¶ 9        Defendant grew frustrated with D.D. and told her that he loved her. She replied that she loved him, hoping that if she "told [defendant] what he wanted to hear [then] he would stop and he would calm down." Defendant's tone became more aggressive. He told her to hold his penis and she refused. Defendant then grabbed her hand and placed it on his penis. He then used his

hand to move hers up and down. D.D. told defendant to stop and that she did not want to do this.

¶ 10        The transcript of their dialogue during this time reads as follows:

"D.D.: Emmanuel. No. Emmanuel. No. You have to go home. Emmanuel, don't. Emmanuel, you have to go home.

Defendant: (inaudible) I was hoping (inaudible).

D.D.:   You have to go home. What are you doing?

Defendant: (Inaudible)

D.D.: No. No. No.

Defendant: You don't want to be treated (inaudible).

D.D.: No.

Defendant: Stop what you're doing, it's fine.

D.D.: No. Emmanuel. No. No. (Moans) Okay. Okay.

Defendant: Yeah.

D.D.: Okay.

Defendant: Don't touch me. I want to take care of you. Don't touch my hand.

D.D.: Emmanuel, no. (Inaudible)

Defendant: Do you love me?

D.D.: Yes, I love you.

***

D.D.: No.

***

Defendant: Go and touch it.

D.D.: Emmanuel, no. I don't want to.

Defendant: Just go. Just go and touch it.

D.D.: No. Emmanuel, no.

Defendant: Come on. What you scared of d***? Hold it. I said hold it. Grab it. I said, grab it. You don't understand – grab it.

D.D.: No. No. No.

Defendant: I'm doing it because I love you. Come on. What's wrong with you – you think I'm doing cause I'm crazy or what? I do because I love you.

D.D.: You have – to go."

* * *

Defendant: Come on, so chill out.

D.D.: Emmanuel, it's three o'clock in the morning. You have to go home.

Defendant: Can you stop it? *** No. That's what you trying to do. You're trying to stop me from loving you. You don't want me to be touching you (inaudible). I want to touch you. *** Stop grabbing my hand away.

D.D.: Emmanuel, stop. It's time to go home.

Defendant: Relax.

D.D.: Emmanuel, you have to go.

Defendant: Just relax. What's wrong with you?

D.D.: No, I don't want to.

Defendant: Don't want to what? So you trying to tell me I can't have you?

D.D.: Yes. (Inaudible) cannot.

Defendant: Please, come on, baby. I don't get it. What's wrong?

D.D.: It's time to go home."

***

Defendant: Then why you trying to push me away?"

¶ 11 Eventually, defendant got off D.D. and started to fall asleep. D.D. considered letting him stay because he had stopped. Instead, she started arguing with defendant about trust and demanded that he give her the password to his cellphone. She expected that he would not provide it and hoped the argument would prompt him to leave.

¶ 12 After further conversation, defendant left to go to the bathroom. D.D. explained that she decided not to leave at that time since she "felt [she] had successfully diffused everything." She discovered that her iPad had stopped recording and subsequently reactivated it upon defendant's return.

¶ 13 Defendant got on top of D.D. and started groping and sucking her breast. D.D. asked defendant to stop and struggled to get away, but he grabbed her hand and held her down. Defendant momentarily stopped when D.D. told him she was a virgin.

¶ 14 Defendant asked D.D. about her virginity and, after a while started groping her again. She tried to stop him, but he held her left arm above her head and pinned her down. D.D. told defendant she "wasn't ready" and got up and turned on the lights. She testified that she was going to leave the room but decided to slap defendant in the face multiple times because she was upset. She claimed that defendant's reaction to the slaps made her laugh and that she laughs when she is uncomfortable or stressed.

¶ 15 D.D. then went downstairs to get campus security so they could remove defendant from her room. The police eventually arrived and placed defendant in custody. The police collected D.D.'s clothing, the wine bottles, and iPad. After being interviewed by the police, D.D. was taken to the hospital where a sexual assault kit was collected.

¶ 16    On cross-examination, D.D. testified that when she is heard on the audio recording telling defendant, "Okay, okay," she was trying to stop him from grabbing her breast so aggressively. D.D. also explained that what sounded like moaning and heavy breathing was not sexual arousal but resulted from her physical struggle to resist the defendant. D.D. acknowledged that she had multiple opportunities to leave the room and summon security but did not do so.

¶ 17    D.D. was asked about an interview with an officer at the Northwestern University Police Station. When she responded that the interview had been videotaped, defense counsel informed the trial court that he was unaware of any such electronic recorded interview (ERI).

¶ 18    When the trial was continued, the parties conferred and agreed that the State had inadvertently failed to tender the ERI to the defense in pretrial discovery. Defense counsel filed a motion for discovery sanctions. He argued that the ERI would have affected his trial strategy, particularly for counts 3 and 4, which were premised on acts D.D. claimed to have occurred when her iPad was not recording. D.D.'s ERI was consistent with her trial testimony about those acts. Counsel asserted that pretrial disclosure of the ERI would have also affected his advice to the defendant about the State's plea offer. As a remedy, counsel requested that the trial court order specific performance of the misdemeanor plea offer that the State tendered prior to trial.

¶ 19    The State objected to specific performance of the prior plea offer, but it *nolled* counts 3 and 4: a count of attempt criminal sexual assault and a count of criminal sexual abuse. The trial court denied defense counsel's motion for discovery sanctions, ruling that "there was no intent on the part of the State to withhold any evidence from the defense." The court determined that any prejudice to the defendant was cured by the State's dismissal of counts 3 and 4.

¶ 20    When the trial resumed, stipulations were read into the record. These included that a sexual assault kit was collected from D.D., a general exam uncovered no abnormalities, a genital exam

was not performed, and a buccal swab standard was collected from the defendant. Additionally, the parties stipulated that the defendant's DNA was a match for a biological sample swab taken from the right side of D.D.'s neck. The State rested.

¶ 21    Defense counsel moved for a directed finding of acquittal. The trial court granted the motion as to the two counts of criminal sexual assault.

¶ 22    The parties then stipulated that, in the Spring following this incident, D.D. made assault allegations against a professor at Baylor University, which she purported to have recorded on her cell phone. D.D. claimed that the professor pushed her after she had gone to his office to complain about his referral for academic discipline for plagiarism. The University investigated and determined that she gave inconsistent and false statements, and her assault claim was unfounded.

¶ 23    Defendant chose not to testify.

¶ 24    The trial court found the defendant guilty of the remaining three counts of criminal sexual abuse. The court remarked that it had "no doubt in [its] mind" that the State had proven the defendant guilty beyond a reasonable doubt. The court subsequently denied defendant's motion for a new trial and sentenced him to two years' felony probation, along with a sex offender evaluation and treatment, sex offender registration, STD/HIV testing, and a two-year civil no contact order. This timely appeal followed.

¶ 25                II. ANALYSIS

¶ 26                A. Sufficiency of the Evidence

¶ 27    Defendant contends the State failed to prove that he used or threatened force or disprove his affirmative defense of consent beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. The trier of fact determines the credibility of witnesses, the weight to be given to their testimony, resolves conflicts in evidence, and draws reasonable inferences from the evidence. *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 54. We will not substitute our judgment for that of the trier of fact on issues concerning the credibility of witnesses and the weight of the evidence. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-5 (2009). A criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Cline*, 2022 IL 126383, ¶ 25.

¶ 28    Defendant was convicted of three counts of criminal sexual abuse pursuant to section 11-50(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.50(a)(1) (West 2014)). The relevant portion of this section provides that a person commits criminal sexual abuse if the person "commits an act of sexual conduct by the use of force or threat of force" *Id*. Under the Code "Sexual conduct" means:

> "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2018).

¶ 29    When, as here, a defendant raises consent as an affirmative defense, the State has the burden of proving lack of consent beyond a reasonable doubt. *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). The Code defines "Consent" as:

> "a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of

force or threat of force by the accused shall not constitute consent. The manner of dress of the victim at the time of the offense shall not constitute consent." 720 ILCS 5/11-0.1 (West 2018).

The State, however, does not prove the offense of criminal sexual abuse by merely establishing that the victim did not consent. *People v. Mpulamasaka,* 2016 IL App (2d) 130703, ¶ 74 (citing *Haywood*, 118 Ill. 2d at 274). The State must also prove that the defendant used or threatened to use force. *Haywood*, 118 Ill. 2d at 274 ("the State has a burden of proof beyond a reasonable doubt on the issue of consent as well as on the issue of force.").

¶ 30     "Force or threat of force" includes overcoming "the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2018). "The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual [conduct]." *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. "To prove force, there is no definite standard establishing the amount of force the State must prove and each case must be considered on its own facts.*" People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. However, the force necessary to prove the criminal offense requires something more than the force inherent in the sexual conduct itself. *Id.* When considering the evidence of force, courts may consider the size and strength of the defendant and the victim as well as the place and conditions under which the incident occurred. *Id.*

¶ 31     Although defendant challenges the sufficiency of the evidence as to both force and consent, his argument on each issue is the same: D.D. consented to the sexual conduct, therefore, he did not use or threaten force. Defendant relies on the audio recording, which he insists proves that D.D. consented. Specifically, he points to portions where D.D. says, "Okay, okay," and tells defendant that she loves him. He also notes that D.D. had the chance to leave after the alleged abuse had

occurred but remained in the room and spoke with defendant for more than an hour. What is more, she started an argument about defendant's phone password and referred to his communications with other women. Defendant further submits that despite knowing she was recording their interaction, D.D. never states that defendant is doing anything to force the acts of sexual conduct. Above all, defendant emphasizes that D.D. can be heard moaning and breathing heavily, which he asserts as proof that D.D. was sexually aroused. Defendant acknowledges that the trial court's assessment of D.D.'s credibility and the weight of the evidence is due deference, but he contends that the audio recording makes the evidence so unreasonable, improbable, and unsatisfactory as to justify a reasonable doubt of his guilt.

¶ 32       Even though defendant recognizes that we will not substitute our judgment for the trial court, his arguments, to an extent, ask that we do so. Some aspects of the audio recording are open to interpretation. D.D. testified that when she said, "Okay, okay," and told defendant that she loved him, she was trying to make defendant relent. She further explained that she did not leave her room at earlier opportunities because she felt that she had diffused the situation. Likewise, D.D. explained that the password argument was a strategy to prompt defendant to leave. And she attributed her moaning and heavy breathing to physical exertion to resist the defendant who was on top of her and grasping her hand. See *Mpulamasaka,* 2016 IL App (2d) 130703, ¶ 74 ("Force can be established by evidence that the defendant used his bodily inertia to prevent the victim from disengaging."). Defendant asserts that D.D. explanations are "*post hoc* recharacterizations" of evidence that show her consent and the lack of force. By arguing so, however, defendant demands that we interpret the evidence as he wishes. That would amount to retrying the defendant and substituting our judgment for the trial court. The trial court was free to accept or reject all or part of D.D.'s testimony. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. So, even if the trial court

found some of D.D.'s testimony incredible, it was not required to find her wholly incredible. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Moreover, her explanations, which defendant calls "*post hoc* recharacterizations," were not so unreasonable, improbable, and unsatisfactory that the trial court could not accept them. The trial court was in the best position to judge D.D.'s credibility. Likewise, "[t]he question of whether force or threat of force was used is best left to the trier of fact who heard the evidence and observed the demeanor of the witnesses." *Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. We will not substitute our judgment for the trial court on these issues.

¶ 33    Nevertheless, defendant seems to argue that the audio recording is not open to interpretation. Rather, he contends that the recording so clearly evinces D.D.'s consent that he cannot be guilty of criminal sexual abuse. We disagree.

¶ 34    Defendant argues that the audio recording reveals there was no force since D.D. never made any contemporaneous statement that defendant was using force. It was not what D.D. said, however, that shows he was using force: it was the defendant's own words. Defendant tells D.D., "Stop what you're doing. *** Don't touch me. *** Don't touch my hand." He later exclaims, "That's what you['re] trying to do. You're trying to stop me from loving you. You don't want me touching you. *** I want to touch you. *** Stop grabbing my hand." Thus, he acknowledged that D.D. was physically resisting him while he was touching her. At another point, defendant says, "Hold it. I said hold it. Grab it. I said, grab it. I said, grab, it." Defendant's repeated commands indicate D.D. was not touching his penis of her own volition. Then, defendant puts a finer point of what is happening when he says, "*I'm* doing it because I love you." What was *he* doing? Recall that defendant does not deny that he touched her breast or her hand with his penis. Since that occurred while D.D. was resisting him and not heeding his commands, which his words show, it follows that defendant did so by overcoming D.D. with superior physical strength; that is, force.

Also recall that, all the while, D.D. is saying, "No," "I don't want to," and "You have to go." Although physical resistance or demonstrative protestations are not necessary to prove that a victim was forced (*Mpulamasaka,* 2016 IL App (2d) 130703, ¶ 74), the repeated and unmistakable presence of both in this case are strong indicia that D.D. was forced.

¶ 35     Similarly, we reject defendant's suggestion that D.D. saying "no" in the audio recording merely shows hesitance or ambivalence while "she is consenting by her nonverbal reactions to the contact." D.D. tells defendant to leave or "go home" at least 25 times before or while the abuse occurs. She was very clear that he was not permitted to stay, and she had no intention of sexual conduct with the defendant that night as she insisted they "take things slow." There was no equivocation. Just before and during the abuse, D.D. said "no," "stop," "I don't want to," or words to similar effect at least 20 times by our count—hardly ambivalence. To be sure, defendant supplies the evidence that D.D. is not consenting when he asks, "So you trying to tell me I can't have you?" and she answers, "Yes." Contrary to defendant's interpretation, the audio recording gives clear evidence, including the defendant's own words, to show that D.D. did not consent. No "nonverbal reaction," whatever that means, could be reasonably understood to negate her repeated unambiguous statements. No doesn't mean maybe. No doesn't mean convince me. No means no.

¶ 36     We find that the evidence was sufficient for a reasonable fact finder to find, beyond a reasonable doubt, that defendant used force and that D.D. did not consent.

¶ 37                                B. Discovery Violation

¶ 38     Defendant finally contends the trial court erred by denying his request for specific performance of a plea offer, as a remedy for the State's inadvertent pretrial discovery violation. Defendant argues he was prejudiced by his inability to review the ERI prior to trial because it affected his strategy and his decision whether to accept the State's plea offers.

¶ 39    "The goals of discovery are to eliminate surprise and unfairness and to afford an opportunity to investigate. [Citation]. Discovery sanctions are designed to further these goals and to compel compliance rather than to punish. [Citation]." *People v. Rubino*, 305 Ill. App. 3d 85, 87 (1999).

¶ 40    Illinois Supreme Court Rule 415(g)(i) authorizes a trial court's imposition of sanctions for a party's inadvertent failure to comply with discovery orders. Ill. S.Ct. R. 415(g)(i) (eff. Oct. 1, 1971); *Rubino*, 305 Ill. App. 3d at 87. The correct sanction to be applied for a discovery violation is a decision resting within the discretion of the trial court whose decision will not be disturbed absent a showing of prejudice or surprise. *People v. Carr*, 149 Ill. App. 3d 918, 929 (1986).

¶ 41    In this case, we cannot find that defendant was surprised or prejudiced. The record reveals that approximately a year prior to trial, as part of the original discovery, the State tendered a police report that included information that an officer had conducted an audio-videotaped interview with D.D., which was referenced in a supplemental report. The supplemental report contained a written summary of the recorded ERI. Thus, defendant was on notice of the substance of the ERI well in advance of trial and he cannot show surprise. In addition, the defendant was not prejudiced since the trial court gave defendant approximately two weeks to review the actual ERI before the trial resumed. Moreover, any potential prejudice was cured when the State *nolled* counts 3 and 4. Defendant's claimed prejudice related solely to those counts.

¶ 42    We also find that since there was no plea agreement, specific performance cannot be ordered. "In the absence of a guilty plea, or a defendant's surrendering of a constitutional right in reliance on the plea agreement, specific performance is not available." *People v. Budinger*, 230 Ill. App. 3d 279, 286 (1992).

¶ 43    Here, the record shows that defendant rejected three separate pretrial plea offers, each of

which would have resulted in only a misdemeanor conviction. On January 20, 2021, the State tendered an offer to reduce the charges to misdemeanor battery. Defendant rejected the offer and was given admonishments pursuant to *People v. Curry*, 178 Ill. 2d 509 (1997). On April 26, 2021, the State renewed its offer to reduce the charges to a misdemeanor and offered probation with sex offender treatment. Defendant rejected that offer as well. The State again, on July 14, 2021, renewed its offer to reduce the charges to a misdemeanor with 18 months supervision. Defendant was again given *Curry* admonishments and declined the offer. Thus, as the record shows, there was never an accepted plea offer and therefore a plea agreement to be enforced.

¶ 44      The cases cited by defendant are distinguishable and do not support his contention that the correct remedy for the discovery violation was specific performance of the misdemeanor plea offers. *Lafler v. Cooper*, 566 U.S. 156 (2021) and *Curry* both concern claims of ineffective assistance of counsel related to plea offers. See *People v. Hale*, 2013 IL 113140, ¶ 19. In *Lafler*, the issue was whether the petitioner was prejudiced by counsel's advice to reject a plea offer and proceed to trial. *Lafler*, 566 U.S. at 160. In *Curry*, our supreme court determined that the defendant was denied effective assistance during plea negotiations when counsel incorrectly informed defendant about mandatory consecutive sentencing. *Curry*, 178 Ill. 2d at 536-37. This appeal does not involve allegations of ineffective assistance of counsel during plea negotiations.

¶ 45      In sum, we find the trial court did not abuse its discretion by denying defendant's request for specific performance of a plea offer as a remedy for the State's inadvertent discovery violation.

¶ 46                                    III. CONCLUSION

¶ 47      For the foregoing reasons, we affirm the judgment of the trial court.

¶ 48      Affirmed.